DURAND ASSOCIATES, INC., A CORPORATION, APPELLANT AND CROSS-APPELLEE, V. GUARDIAN INVESTMENT COMPANY, A CORPORATION, APPELLEE AND CROSS-APPELLANT, M. L. STRONG ET AL., APPELLEES AND CROSS-APPELLEES.
183 N. W. 2d 246

Filed January 29, 1971. No. 37598.

350

Lyle E. Strom, C. L. Robinson, and Fitzgerald, Brown, Leahy, McGill & Strom, for appellant.

Pilcher, Howard & Dustin, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

This is a law action to recover fees for professional engineering services, pursuant to a contract for the erection of an apartment building which was never constructed because the construction bids were substantially in excess of an alleged estimate. Defendant Guardian Investment Company, hereinafter referred to as Guardian, cross-petitioned for alleged damages because of an inadequate estimate. At the close of the evidence, the trial court directed a verdict for the defendants on plaintiff's petition, and for the plaintiff on the Guardian cross-petition. Plaintiff perfected an appeal and defendant, Guardian, a cross-appeal.

William H. Durand is the president and sole stockholder of the plaintiff corporation. Durand is a licensed professional engineer and in the practice of his profession designs buildings and other structures. The defend-

ants, M. L. Strong and Theodore H. Lundt, are the sole stockholders of Guardian Investment Company, a corporation. Strong and Lundt, through another corporation, Elshire Investment Company, owned property at Forty-Second and Emile Streets in Omaha, Nebraska.

Sometime during the early part of 1962, Strong and Lundt visited with Durand about the construction of a medical clinic on their property For reasons not material here, the erection of a medical clinic was abandoned and the parties discussed the erection of an apartment building. Durand prepared preliminary plans for the apartment building. He was informed by the defendants that Guardian had no money and would have to borrow most of the cost of the building except for the cost of the site and certain costs which were to be borne by them. After preliminary plans and negotiations, Durand submitted a standard form of agreement between owner and architect to Strong and Lundt. Certain objections were made by them to the submitted contract, and Durand took it back to his office for revision. It was subsequently returned to them for signature by an associate of Durand. At this time, it had a construction cost estimate of $629,000 to which the defendants objected. The undisputed evidence on this figure is the testimony of Strong, as follows: "Well, I seen the 629,000, I said, 'Well, Jack, this isn't right, where did you get the 629,000?' I says, 'This building is to be built for the $420,000 we had previously discussed.' So he gets on the phone and calls Mr. Durand, and he tells me after, he says, 'Well, Mr. Durand says go ahead and change it to 420,' that his girl evidently took that off of an estimate and put it in there. Q. Was it changed right then and there? A. It was changed right there, and both of us initialed it."

Before insertions, the contract, so far as material herein, read as follows: "5 PAYMENTS Payments to the Architect on account of his fee shall be made as follows, subject to the provisions of Article 4:

"Upon completion of the preliminary studies, a sum equal to 25% of the basic rate *computed upon a reasonable estimated cost.* (Italics supplied.)

"During the period of preparation of specifications and general working drawings, monthly payments aggregating at the completion thereof, a sum sufficient to increase payments to 75% of the rate or rates of commission arising from this Agreement, computed upon a reasonable cost estimated on such completed specifications and drawings, or if bids have been received, then computed upon the lowest bona fide bid or bids.

"From time to time during the execution of work and in proportion to the amount of service rendered by the Architect, payments shall be made until the aggregate of all payments made on account of the Architect's compensation under this Article, but not including any covered by the provisions of Article 4, shall be a sum equal to the rate or rates of commission arising from this Agreement, computed upon the final cost of the Project.

"Payments to the Architect, other than those on his compensation, fall due from time to time as his work is done or as costs are incurred.

"No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages, or other sums withheld from payments to contractors."

The material insertion in the contract is as follows: "Payments to the architect will be made on a monthly basis, payments to be prorated equally over a twelve month period beginning with this contract date. Payments will be based on estimated construction costs until actual costs are determined at which time the amount of the payments will be revised accordingly. (Construction cost estimate $420,000.) WHD & Ass J.C.J. 1/7/62 MLS

"Painting and decorating; Ground and preparation; & All apartment furnishings excluded from project costs. WHD & Assoc J.C.J. 1/7/69 MLS." Four payments

of $1,750 were made on the contract, obviously based upon the estimate of $420,000.

The big dispute in this action involves the interpretation of the contract. The proper construction of a written contract is a question of law to be determined by the courts. Bishop Cafeteria Co. v. Ford, 177 Neb. 600, 129 N. W. 2d 581. Plaintiff insists that the $420,000 figure was intended only as a figure for preliminary payment of fees to the architect. Defendants insist that the construction cost of the project was not to exceed $420,-000, exclusive of painting and decorating, ground and preparation, and all apartment furnishings. The contract is the standard form used by the American Institute of Architects and was prepared by the plaintiff. Therefore, it must be strictly construed against the plaintiff and in favor of the defendants.

We agree with the construction of the contract by the trial court that the inserted paragraph is in conflict with article 5 and is controlling over it. Plaintiff's argument on the meaning of the contract does not embrace the realities of such situations. We interpret the insertion in parentheses of the words "Construction cost estimate $420,000" to mean exactly what it says. The estimated cost of construction was $420,000, exclusive of the mentioned exclusions. It strains credulity to believe any businessman or private corporation would enter into a substantial building project without insisting on some estimate of cost. Plaintiff's expert witness testified that a cost estimate is valuable information to give a client before entering into a contract, and that it would be very unusual for an architect not to discuss costs, for estimating costs are a part of the design of a project.

After plaintiff prepared the plans and specifications it took bids in conformity with the specifications. The low bids received totaled $724,535. While this figure may have embraced some of the exclusions, even then it is at least 72 percent above the construction estimate. These bids were submitted to Strong and Lundt, who

told Durand the cost was too high to permit them to proceed, and asked what could be done to lower it. Durand visited with some of the bidders, suggested the elimination of certain items, and came up with a modified bid of $652,728. This figure was still too high for the defendants and the project was abandoned.

Plaintiff relies for recovery on two provisions of the contract. First, the following language from article 4: "If any work designed or specified by the Architect is abandoned or suspended, in whole or in part, the Architect is to be paid for the service rendered on account of it"; and, second, article 8: "When requested to do so, the Architect will furnish preliminary estimates on the cost of the Project, but he does not guarantee such estimates."

With reference to the first provision, if, as we shall discuss later, an architect or engineer who excessively overestimates the probable cost at which a building can be erected is not entitled to fees, then this provision could have no application.

We interpret article 8 to mean that the architect does not guarantee the exact figure but only represents that the estimate furnished is a reasonable approximation of the cost of the project. If, as the plaintiff seems to infer, it means that an architect will under no circumstances be bound by his estimate, we would consider it contrary to public policy because it would mean that no matter how large the bid for doing the work, defendants would be obligated to pay an architectural fee based on that amount. Reading the contract as submitted, we conclude the intent of it to be that any estimate furnished is a reasonable cost estimate.

Durand's profession required him to keep informed on building costs and in case of any question he could readily ascertain the approximate cost on any project. His knowledge in this respect was superior to that of the defendants. Durand held himself out as an expert in his field. He was supposed to be skilled in estimat-

ing costs of construction. Those employing him or his firm had a right to expect that he would exercise that skill and judgment. It was his affirmative duty to give the defendants some definite idea of the reasonable cost of the project. It is immaterial whether or not the defendants told him, as they contend, that the cost could not exceed $420,000 above the exclusions. When that figure was included in the contract, he was bound by it. If it was not a realistic estimate, he should have disclosed to the defendants that the plans proposed by him could not possibly be carried out for that figure. He was duty bound to make full disclosures of all matters of which he had or should have had knowledge which it was important that his clients should know.

There are many cases discussing the effect of underestimating the cost of construction on the compensation of architects and engineers. Some of them are collected in an annotation at 20 A. L. R. 3d 778. There are many courts which deny compensation where the actual or probable cost of construction exceeds the estimated cost. We believe some of these cases apply too stringent a rule. We prefer to hold that an architect or engineer may breach his contract for architectural services by underestimating the construction costs of a proposed structure. The rule to be applied is that the cost of construction must reasonably approach that stated in the estimate unless the owner orders changes which increase the cost of construction. It is ordinarily for a jury to say whether the actual cost is within a reasonable range of the estimated cost unless, as here, the excess is so great that the court can deal with it as a matter of law.

There is further reason why plaintiff cannot recover herein. The contract as modified does not provide for any allocation of the fees to particular stages of the execution of the work. It provides for monthly payments until the $21,000 based upon the $420,000 estimate is paid. On this construction, ignoring plaintiff's breach

as set out above, the proper measure of damages would be the reasonable value of the service rendered by the plaintiff plus any loss of profit, assuming a wrongful breach on the part of the defendants. As the trial court found, there was insufficient evidence of the reasonable value of the services rendered to submit that issue to the jury. In any event, in this case only the preliminary work or that previous to the execution of the contract could be covered by this rule. Recovery cannot be had on a quantum meruit by a party who breaches a contract against one receiving no benefit from the performance of the services for which recovery is sought.

The trial court sustained plaintiff's motion for dismissal of the cross-petition on three grounds: (a) Guardian is not the real party in interest; (b) there is no sufficient evidence of an appropriate measure of damages; and (c) granting the right of Guardian to recover the $7,000 in progress payments, the measure of recovery could not ignore the reasonable value of plaintiff's services prior to the time of the execution of the written contract.

Guardian argues that the plaintiff did not specifically plead it was not the real party in interest, and therefore was barred from raising that defense at the close of the evidence. Ordinarily the defense of not being the real party in interest must be specially pleaded and cannot be raised by a general denial, which was the plea herein. However, that is not true in this situation. Guardian alleged it had expended certain sums of money. Plaintiff denied that fact, and the burden was on Guardian to prove it. We hold that the rule requiring the defense that plaintiff is not the real party in interest to be specially pleaded is not applicable where the case is one in which the facts showing interest must be established as an essential of the cause of action, or where the circumstances of the case are such that the objection raised goes to the existence of the cause of action.

Involved in the Guradian cross-petition are excavating

costs of $1,167; a loan fee of $4,900 for a $490,000 loan commitment; a loss of $6,814 on steel prepurchased to avoid a price increase; and four progress payments of $1,750 each on plaintiff's fees pursuant to the contract, or $7,000.

The contract was signed January 7, 1963. The working drawings were completed May 23, 1963. Bids were opened on June 7, 1963, and the final bids were received by June 28, 1963. All of the payments included in the cross-petition were made prior to the receipt of the bids from the contractors. There is no sufficient showing that Guardian incurred the obligations. None of them were billed to or paid by Guardian.

The excavating was billed to T. H. Lundt and paid by Elshire. There is no specific showing of any loss on this item to Guardian or anyone else. Strong's testimony would indicate that the land was sold by Elshire previous to the trial, with no evidence as to how the value of the property may have been affected.

The loan commitment was made to Melvin Strong and Theodore Lundt, who are listed therein as the borrowers. Nowhere in the commitment is there any reference to Guardian nor does it appear to be a party to the commitment. Exhibit 19 acknowledges receipt of $4,900 from Elshire Investment Company, and the funds are to be returned to it with interest unless forfeited as liquidated damages if "Elshire Investment Company does not close out the mortgage loan * * *."

Strong and Lundt believed that steel prices were rising and ordered the necessary steel before the bids were opened. Exhibit 16 would indicate this was done in the name of Harney Realty Company which is operated by Strong. None of the steel had been delivered by the steel company although some of it had been cut in certain lengths. When the project was abandoned, Strong settled this item for $6,814, and the bill was paid by Elshire. Most of the damage involved resulted from the

fabrication of the steel. There is no evidence to show any need of this before the bid letting.

What we have said as to the other items of alleged damages applies with equal force to the four payments made on the plaintiff's fee by Elshire.

It is undisputed Guardian had no funds and that all of these payments were made by Elshire Investment Company, another corporation owned by Strong and Lundt. It is of interest that the land on which the apartment building was to be constructed was owned by Elshire and was subsequently sold by it. There is no evidence in this record that it was ever transferred to Guardian. Also, the plans and specifications in evidence refer to the project as "Elshire Apartments." The only evidence in the record pertinent to these payments, other than the fact that they were made by Elshire, is the following from the testimony of Strong: "Q. And the payment that was made to Mr. Kleager for the excavation on this site was made by Elshire Investment Company? A. Yes, it must have been, because Guardian didn't have any funds at that time. Q. Do you have any records here in the courtroom that indicate that Guardian Investment Company ever made any payments to Elshire Investment Company regarding any of these items? A. I recollect in the minutes of the corporation it showed that Guardian had borrowed a certain amount of funds, or owed Elshire a certain amount of funds for this project. This was just recited in the minutes of the meeting. Other than that I don't have— Q. But to your knowledge there has never been any made by Guardian Investment to Elshire on this project; is that right? A. No, I don't believe so, sir."

Guardian had the burden of proving that in reliance upon the contract it expended the funds for which it now seeks recovery. That burden is not met by proving that the items were billed to other parties, and that Elshire made the expenditures. Elshire is not a party to the contract and is not involved in this litigation. While

Strong and Lundt were the sole owners of both corporations, the payments were made by one corporation and the cross-petition was filed by the other. Strong and Lundt deny personal liability herein and did not join Guardian in its cross-petition. It is their position that they signed for the corporation in a representative capacity. The contract itself would seem to indicate otherwise, but in view of our holding on the plaintiff's action and the position of Strong and Lundt, it is not necessary to discuss or meet that issue.

We affirm the judgment of the trial court dismissing both the petition and the cross-petition.

AFFIRMED.