FREDRICK M. GETZSCHMAN, A.I.A., APPELLEE, V. MILLER
CHEMICAL COMPANY, INC., A NEBRASKA CORPORATION, AND
LAWRENCE HOFFMAN, APPELLANTS, CAROL HOFFMAN, APPELLEE.
443 N.W.2d 260

Filed July 21, 1989. No. 87-746.

William F. Hargens, of McGrath, North, O'Malley & Kratz, P.C., for appellants.

Timothy J. Cuddigan, of Marks & Clare, for appellee Getzschman.

HASTINGS, C.J., WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and McGINN, D.J.

SHANAHAN, J.

In the district court for Douglas County, Fredrick M. Getzschman, an architect, filed a breach of contract action against Lawrence (Larry) Hoffman, Carol Hoffman, and Miller Chemical Company, Inc. (Miller), a Hoffman family corporation for which Larry Hoffman was executive vice president and general manager. Getzschman based his action on his written contract to design a family home for Hoffmans and claimed $35,999.97 in damages. The defendants denied liability and counterclaimed against Getzschman. At trial, the court dismissed Getzschman's claim against Carol Hoffman. The jury returned a verdict of $35,999.97 for Getzschman and found against Hoffman and Miller on their counterclaim. Joinder of the defendants and joint or several liability are not issues in this appeal. In view of the nature of the errors assigned, a detailed narrative is necessary.

## GENERAL BACKGROUND

Sometime early in 1985, Hoffmans first met with Getzschman to discuss expansion of Hoffmans' existing home, namely, enlargement of one of the Hoffman house's bedrooms and the addition of two bedrooms and a bath. Hoffmans agreed to pay Getzschman $50 per hour to design the proposed expansion. According to Getzschman, Larry Hoffman never mentioned a budget or other limitation of cost for the project, but wanted to add no more than 1,000 square feet to Hoffmans' house. Larry Hoffman told Getzschman about Hoffman's

background in construction, experience which Hoffman used in estimating that the proposed expansion would cost between $75 and $80 per square foot.

Getzschman prepared designs pursuant to Hoffmans' request. Hoffmans then took Getzschman's designs to Donald Bassler, a personal friend of Larry Hoffman and president of Ronco Construction Company, and Bassler estimated the construction cost at a range between $70,000 and $85,000 based on Getzschman's design for the expansion. Due to bad soil conditions at the site of the planned expansion, the addition to Hoffmans' house was abandoned in May 1985, and Hoffmans decided to build a new house on a different lot. At Larry Hoffman's request, Getzschman's bill for the abandoned expansion was sent directly to Miller, which issued its check to pay Getzschman.

In early June 1985, Hoffmans met with Getzschman regarding his designing Hoffmans' new home. According to Getzschman, much of this meeting was spent discussing the terms of Getzschman's employment. Getzschman outlined his services as the architect for Hoffmans' new house and referred to a standard preprinted agreement for architectural services. The printed contract obligated Getzschman to provide "cost estimating services," an appraisal service in which the architect attempts to determine the cost of constructing the home as designed. Getzschman testified that Hoffman said it was unnecessary to provide cost estimating on the new home because Bassler would estimate the construction cost "like he did on the addition project," which had been abandoned. In place of architectural cost estimating, Hoffman requested Getzschman to double his jobsite inspections during construction of the new house. Getzschman testified that Hoffman gave no indication about the amount he wanted to spend for the new house, but Hoffman testified that when he and his wife first visited with Getzschman concerning their new house, Getzschman was informed that Hoffmans did not want to spend more than $250,000 on construction. Getzschman told Hoffmans to clip articles or advertisements from magazines which depicted design features the Hoffmans might want to incorporate into their new home.

## THE CONTRACT

Sometime before June 10, 1985, Getzschman mailed a form contract to Larry Hoffman, who, after "scanning" the contract, signed the agreement as executive vice president of Miller, which was designated as the "owner" in the architectural contract submitted by Getzschman. The contract, entitled "Standard Form of Agreement Between Owner and Architect for Housing Services With Cost Estimating Services Provided by Owner," stated that Getzschman's fee would be 10 percent of the construction cost of the house. "Construction cost" was defined in the contract as "the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect." Twenty percent of Getzschman's fee was to be paid on completion of the "design phase" of the project, 55 percent on completion of the "construction documents phase," 5 percent on completion of the "bidding or negotiation phase," and the remaining 20 percent on completion of the "construction phase." Article 2 of the contract was entitled "The Owner's Responsibilities" and specified: "2.6 The Owner, unless otherwise provided in Article 10, shall furnish the services of a cost consultant or cost estimator to provide all construction cost data, Statements of Probable Construction Cost or other cost estimates as the Architect's work progresses." Article 10, entitled "Other Conditions or Services," contained a space for insertion of additional provisions in the contract. In this space on the Getzschman-Hoffman contract, the following was typewritten:

> Concerning Article 1.4 of this agreement [architect's duties during the construction phase of the project], the Architect shall visit the site of the work semi-monthly for the purposes of inspection of progress, as part of the Basic Services of this agreement. If more frequent visits are requested by the Owner, they shall be paid for as "Additional Services" . . . .

Concerning termination of the agreement, article 7 provided in part:

> 7.1 This Agreement may be terminated by either party upon seven days' written notice should the other party fail substantially to perform in accordance with its terms

through no fault of the party initiating the termination.

. . . .

7.3 In the event of termination not the fault of the Architect, the Architect shall be compensated for all services performed to termination date, together with Reimbursable Expenses then due and all Termination Expenses as defined in Paragraph 7.4.

7.4 Termination Expenses include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount computed as a percentage of the total compensation earned to the time of termination, as follows:

.1 20 percent if termination occurs during the Design Phase, or

.2 10 percent if termination occurs during the Construction Documents Phase, or

.3 5 percent if termination occurs during any subsequent phase.

Paragraph 8.4 of the agreement provided in part: "This agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect."

Thus, the architectural contract signed by Larry Hoffman did not contain a cost limitation or include a budget restriction on construction.

## DESIGN AND CONSTRUCTION

On June 20, 1985, Getzschman met with Hoffmans at the Miller offices, where Hoffmans gave Getzschman various magazine photographs depicting features to be incorporated into Hoffmans' new home, including a curved staircase, notwithstanding Getzschman's warnings that such a staircase "could be very expensive to execute." Larry Hoffman testified that when he asked Getzschman about the cost of the curved staircase, Getzschman replied, "Well, you have to have stairs going from the first floor to the second floor. It shouldn't be at all [expensive]." According to Getzschman, the size of the new

home was also discussed with Hoffmans, who expressed their desire that the house contain living space of approximately 3,500 square feet, although Larry Hoffman testified that the specific size of the home was not discussed before initial plans were drafted.

Getzschman testified that after the June 20 meeting, he and Larry Hoffman went to lunch together, and apparently Hoffman attempted to engage Getzschman in a discussion about an estimate or projection of the cost for the new home. When Hoffman asked Getzschman why he was reluctant to provide a cost projection, Getzschman responded that he did not want to do any projections which were not required by his contract for Hoffmans' new home. Getzschman testified that he then asked Hoffman whether he was still planning to use Bassler to do the cost estimates on the home, and Hoffman replied that "he probably would," but not until completion of the design phase of the project.

On June 25, Getzschman delivered the "Schematic Design" to Larry Hoffman, who testified that when he asked Getzschman about the construction cost of the home, Getzschman said that the total construction cost for the 3,900-square-foot house depicted in the schematic design would be $265,000. Hoffman also testified that Getzschman indicated that the new home could be built for about $65 per square foot. Getzschman testified that Larry Hoffman expressed some concern over the size of the home and was also dissatisfied that Getzschman had not included the curved staircase which Hoffmans had specified. Getzschman, however, testified that he "guessed" that the construction cost for the house in the schematic design would be $312,000.

On June 26, Getzschman sent Miller a bill in the amount of $2,487 for architectural services based on a total construction cost of $312,000. Because Getzschman did not have topographic surveys of Hoffmans' lot for the new house, he was unable to prepare a "site layout plan," to show the relationship between the designed house and the lot. Therefore, Getzschman billed for approximately 40 percent of the fee due on completion of the design phase of the project. On July 2, Miller issued its check to Getzschman for payment of the June

26 bill.

On July 2, Getzschman met with Hoffmans to discuss changes in the schematic design. Getzschman testified that at this meeting the "scope of the project was expanded" by a list of 20 changes requested by Hoffmans, which included an increase in size of the master bedroom, changes in the location of a number of rooms, enlargement of the kitchen, addition of a makeup center in the dressing area, enlargement of the closets, addition of the circular staircase, additions of an enclosed terrace and specially designed "shell showers" in the bathrooms, enlargement of the entry area, custom guttering, and the addition of a fireplace and two rotisserie grills. Getzschman also testified that he asked Larry Hoffman whether a set of plans should be prepared for Bassler's cost estimation, and Hoffman answered that "he would take care of that after he reviewed the next set of plans." Larry Hoffman did not deny requesting most of these changes, but testified that Getzschman told him that despite the additions to the schematic design, the house would still cost only $65 per square foot to construct. Getzschman denied mentioning $65 per square foot as a probable construction cost for the home.

Getzschman incorporated Hoffmans' revisions into the design for the new home and met again with them in the middle of July on Hoffmans' boat on the Missouri River. On account of the revisions, the size of the house increased from 3,900 square feet to 4,800 square feet with an increase in cost from $250,000 to somewhere between $300,000 and $350,000, but, according to Larry Hoffman, Getzschman acknowledged that the house in the revised design could be built within the $65 per square foot "budget."

Regarding his June 26 bill for services, Getzschman testified that he told Larry Hoffman that $312,000 was an "estimate or guess" for construction cost of the house in the first set of schematic designs shown to Hoffmans on June 25 and was the basis for the progress payments due under the contract. In his file memorandum concerning the meeting on Hoffmans' boat, Getzschman indicated that he told Hoffmans that the $312,000 figure would be used to determine the amount of progress payments until bids for the project were received, at which time

he would adjust his total bill to reflect 10 percent of the construction cost. Getzschman's memorandum also contained reference to Getzschman's concern, expressed to Hoffmans, whether any cost estimates would be available before a final draft of the plans. Larry Hoffman stated that "he would take care of that [cost estimates], and had past experience from other projects he had built to judge at this point."

On July 22, 1985, Larry Hoffman authorized Getzschman to draft the final plans for the new home. Getzschman also delivered to Hoffman plans for the basement of the home, which had been delayed because a topographic survey of the lot was unavailable. Getzschman testified that Larry Hoffman wanted to put a basement under the entire house, including the garage, but that Getzschman told Hoffman that the expanded basement would be very costly. According to Getzschman, Hoffmans also requested a number of changes and additions to the final plans, some of which Getzschman agreed to do as additional services under the contract, since the changes had been discussed and dismissed earlier during design of the home. Between July 22 and presentation of the final plans, additions made included a seal on the basement and garage floors, a trench drain in the garage, a hanging rack in the garage, L-shaped shoe racks in the closets, an antenna system, a refrigerator and icemaker in the bar, an enclosed toilet in the main bathroom, and "built-ins"—a television and deep fryer for the kitchen and an ironing center.

On July 29, Getzschman sent Miller a second bill for his services and indicated that the total fee for completion of the design phase of the project was $6,240. Larry Hoffman testified that this figure comforted him, because the billed fee confirmed a total construction cost of $312,000. Getzschman gave Hoffmans credit for previous payments and billed them for services relative to the construction documents phase of the project. Getzschman's total July bill was $6,613, which was paid by a check drawn on Hoffmans' personal account on August 2, 1985.

On July 30, Getzschman and Hoffman met to discuss the possibility of custom-made glass windows for the home, an idea which was later abandoned in view of the excessive cost.

Getzschman testified that he once again asked Larry Hoffman whether Hoffman was going to get a cost estimate from Bassler, and Hoffman responded that he was not sure. Getzschman also testified that he told Hoffman that due to the additions made to the home after the completion of the schematic design, Getzschman "feared that we were far from the scope of the project as I had originally envisioned it." Hoffman, according to Getzschman's file memorandum, responded that "he was sure he could build the house for a figure he wanted, but had not determined from his CPA what that figure was yet, and if the bids came in over what he wanted to spend he would negotiate with the lowest bidder to remove the extras."

Getzschman testified that he stopped by Hoffman's office on August 16, 1985, to clarify Hoffmans' requirements for the electrical system in the home. According to Getzschman, Larry Hoffman expressed his concern over the cost of the home, stating that "he [Hoffman] had probably gone over his limit." Getzschman remarked that Hoffman should have been more concerned about costs in July and that Getzschman might be able to remedy any cost concerns by removing some "extravagant items" from the final plans. According to Getzschman, Hoffman turned down this suggestion and decided to evaluate the cost situation after bids on the project were received. Hoffman denied the occurrence of this meeting with Getzschman.

On September 3, Getzschman delivered the final plans and specifications for the house and submitted his bill for the completion of the construction documents phase of the project. At this meeting, Bassler was also present and looked over Getzschman's plans. Bassler testified that after he looked at the plans for 30 seconds to a minute, he told Hoffman that the house would cost between $650,000 and $750,000. Hoffman believed that Bassler was joking about the cost of the home. Bassler and other contractors were invited to bid on the Hoffman project.

Hoffman testified that shortly before construction bids were opened on Friday, September 27, he had lunch with Getzschman. Both guessed at a low bid on the project; Hoffman guessed $350,000, while Getzschman guessed

$340,000. Getzschman gave a substantially different version of the lunchtime conversation with Hoffman, who said that "he was sure the bids were going to come in for more than $500,000." When bids were opened later that afternoon, the low bid was $698,000. Hoffman testified that he was shocked at the bids and asked Getzschman what "went wrong." Getzschman responded, "Boy, I don't know; it beats me." Getzschman, however, testified that he was not surprised by the amounts of the bids and that Hoffman mentioned that the bids were more than Hoffmans wanted to spend on the house. Hoffman, however, did not reject the bids immediately because he wanted to think about the project over the weekend.

On Monday, September 30, Hoffman rejected the bids and contacted Getzschman, asking him to redesign the home at a cost between $300,000 and $400,000. When Hoffman requested the revisions at no extra cost, Getzschman refused and indicated that the revisions would be done only after Hoffman paid for the architectural services already rendered. Hoffman terminated the contract with Getzschman.

On October 1, Getzschman sent a bill to Miller for the total due on completion of the bidding phase, $33,207.97, which was based on the new construction cost of $698,000, the low bid on September 27. Hoffman did not pay this bill, but, instead, took Getzschman's plans to Orlin Johnson, a draftsman, to revise the plans and lessen the construction cost. Johnson reduced the house's size to 4,200 square feet. Hoffman eventually contracted with Ronco Construction, which built the Hoffman house for $328,000. Hoffman paid Johnson $1,476.91 for his services in revising the plans for the house. After reviewing Johnson's designs, Getzschman expressed his opinion that Johnson merely copied the Getzschman plans and design for the house eventually built by Hoffmans.

On November 4, Getzschman sent Miller a final bill for his services in designing Hoffmans' house—a past due balance of $33,207.97, plus Getzschman's termination expenses of $2,792 under article 7 of the architect's contract.

Getzschman subsequently sued Hoffmans and Miller for the balance due on the contract. In their answer, the defendants alleged that Getzschman was barred from recovery by virtue of

his: (1) "failure to perform conditions precedent under the contract"; (2) "breach of fiduciary duty of good faith, loyalty and full disclosure"; and (3) "negligence and breach of duty of reasonable care." The defendants counterclaimed that Getzschman breached the contract by failing to design a house which could be built for the agreed $65 per square foot, by violating a fiduciary duty of "good faith, loyalty and full disclosure," and by failing to use due care (negligence) during preparation of the design.

## EXCLUSION OF TESTIMONY

The defendants called Jerry Gill as an expert witness on architects. When Gill was asked on direct examination about an architect's "customary and standard procedures" in designing a house, the court sustained Getzschman's objection (relevance) and sustained Getzschman's additional objection (relevance) when defendants' counsel subsequently attempted to elicit Gill's testimony regarding the "standard or accepted understanding of an architect's duties as to any steps he follows as he goes through the basic services." The court sustained Getzschman's objections because the case was being tried on a "contract-theory." In an offer of proof, Gill testified that an architect has a duty to advise his client of the cost of all changes requested by the client and that an architect has a duty to design a house which does not substantially exceed the client's budget. In the offer of proof, Gill expressed his opinion, based on an assumption that Hoffmans had given Getzschman a budget of $300,000 to $350,000 for the house, that Getzschman's actions in designing a $698,000 house constituted a breach of an architect's duties of good faith, loyalty, and full disclosure.

## INSTRUCTION CONFERENCE

At the instruction conference, Larry Hoffman and Miller tendered instructions on an architect's duty of reasonable care and fiduciary duty. The tendered instruction on an architect's duty of reasonable care proposed that an architect has the duty to perform contractual duties with "skill, ability, judgment and taste reasonably and without neglect." The tendered instruction on fiduciary duty stated that an architect is "duty bound to make a full disclosure of all matters, of which he has

knowledge, which it is desirable or important that his principal learn." The tendered instruction on fiduciary duty also provided that an architect, who knows that construction cost is an important factor to the architect's client, must supply the client with "some idea of the final cost of the project." The court refused the tendered instructions. Hoffman and Miller objected to the court's instruction outlining the parties' contentions because the instruction did not mention the counterclaim based on "breach of duty." The court remarked: "I am going to rule at this time that a breach of duty is not a proper issue in this case. It is a contract case and I am not going to instruct on it. Your objection . . . is overruled." In instruction No. 10, however, the court gave the following:

> It is the law in Nebraska that in contracts for architectural services the following rules are applicable;
>
> An architect is bound to make full disclosures of all matters of which he had or should have knowledge and which it was important that his client should know.
>
> An architect may breach his contract for architectural services by underestimating the construction costs of a proposed structure if he has agreed to stay within a certain dollar budget.
>
> The rule to be applied is that the costs of construction must reasonably approach that stated in the dollar budget unless the owners order changes which increase the cost of construction.

Consequently, the common denominator in the instructions, both requested and given, was breach of an architect's duties to remain within budget for a project and to inform the client about any important matter, such as cost overrun.

The jury returned a verdict in favor of Getzschman for $35,999.97, the full amount claimed as damages, and found against Hoffman and Miller on their counterclaim. Asserting that "the evidence has established, as a matter of law, a defense to [the] breach of contract," Hoffman and Miller filed a motion for judgment notwithstanding the verdict, new trial, or remittitur, which the court overruled. In its judgment, the district court included an allowance of interest at the legal rate. See Neb. Rev. Stat. § 45-102 (Reissue 1988).

## ASSIGNMENTS OF ERROR

Hoffman and Miller appeal, contending that the district court erred in (1) refusing to instruct the jury regarding an architect's fiduciary duty and the duty of reasonable care; (2) excluding expert testimony offered to prove that Getzschman breached his fiduciary duty and the duty of reasonable care; (3) overruling the appellants' motion for judgment notwithstanding the verdict, a new trial, or remittitur; and (4) including interest in the judgment entered on the verdict. Hoffman and Miller also maintain that the awarded damages are excessive.

## ARCHITECTURAL DUTIES

In *Durand Associates, Inc. v. Guardian Inv. Co.*, 186 Neb. 349, 183 N.W.2d 246 (1971), this court first discussed the nature of an architect's contractual duties to a client. Durand, the architect, agreed to design an apartment building for Guardian Investment, and, after some discussion about cost, a $420,000 figure was inserted as the construction cost estimate in the architectural contract. The lowest bid received on the project was $724,535. When Guardian told Durand that this cost was too high, Durand spoke with some bidders in an attempt to eliminate items and was able to cut the cost of construction to $652,728. However, even the reduced cost figure was too high for Guardian. After Guardian terminated the contract, Durand sued Guardian for breach of contract, and Guardian cross-claimed based on the erroneous construction cost estimate by Durand. At the close of the evidence, the trial court granted directed verdicts in favor of Durand on Guardian's cross-claim and in favor of Guardian on Durand's breach of contract claim.

After noting that the contract obligated Durand to furnish cost estimates when requested to do so, the *Durand* court addressed the architect's contention regarding the contractual language that "[the architect] does not guarantee such estimates."

> Durand's profession required him to keep informed on building costs and in case of any question he could readily ascertain the approximate cost on any project. His

knowledge in this respect was superior to that of the defendants. Durand held himself out as an expert in his field. He was supposed to be skilled in estimating costs of construction. Those employing him or his firm had a right to expect that he would exercise that skill and judgment. It was his affirmative duty to give the defendants some definite idea of the reasonable cost of the project. It is immaterial whether or not the defendants told him, as they contend, that the cost could not exceed $420,000 above the exclusions. When that figure was included in the contract, he was bound by it. If it was not a realistic estimate, he should have disclosed to the defendants that the plans proposed by him could not possibly be carried out for that figure. He was duty bound to make full disclosure of all matters of which he had or should have had knowledge which it was important that his clients should know.

. . . We . . . hold that an architect or engineer may breach his contract for architectural services by underestimating the construction costs of a proposed structure. The rule to be applied is that the cost of construction must reasonably approach that stated in the estimate unless the owner orders changes which increase the cost of construction. It is ordinarily for a jury to say whether the actual cost is within a reasonable range of the estimated cost unless, as here, the excess is so great that the court can deal with it as a matter of law.

*Id.* at 354-55, 183 N.W.2d at 250-51. Because Durand breached the architectural contract by markedly underestimating the cost of construction, he was barred from recovering under the contract.

Hoffman and Miller argue that *Durand* controls the present case, and also seek to hold Getzschman liable under common-law tort theories—breaches of a fiduciary duty and the duty of due care.

If there is an express contract for architectural services, an architect's duties are determined by the contract for the architect's employment. *Guirey, Srnka & Arnold, Architects v. City of Phoenix*, 9 Ariz. App. 70, 449 P.2d 306 (1969);

*Moundsview Ind. S. D. No. 621 v. Buetow & Assoc.*, 253 N.W.2d 836 (Minn. 1977); *Kelly v. Northwest Community Hospital*, 66 Ill. App. 3d 679, 384 N.E.2d 102 (1978); *Cobb v. Thomas*, 565 S.W.2d 281 (Tex. App. 1978); *I. O. I Systems, Inc. v. City of Cleveland, Tex.*, 615 S.W.2d 786 (Tex. App. 1980). Implicit in every contract for architectural services is the duty of the architect to exercise skill and care which are commensurate with requirements of the profession. *Rowe v. Moss*, 656 S.W.2d 318 (Mo. App. 1983); *I. O. I Systems, Inc. v. City of Cleveland, Tex., supra*; *Nelson v. Com.*, 235 Va. 228, 368 S.E.2d 239 (1988). If an architect fails to exercise reasonable professional care in the discharge of his contractual duties, the architect breaches the contract of employment. *Durand Associates, Inc. v. Guardian Inv. Co.*, 186 Neb. 349, 183 N.W.2d 246 (1971).

This court has recognized the principle that " 'accompanying every contract is a common-law duty to perform the thing agreed to be done with care, skill, reasonable expediency, and faithfulness, and a negligent failure to observe any of these conditions is a tort as well as a breach of contract.' " *Driekosen v. Black, Sivalls & Bryson*, 158 Neb. 531, 536, 64 N.W.2d 88, 92 (1954). Although an aggrieved party may choose a tort action rather than a contract action to remedy alleged negligence in the performance of a contract, nevertheless, the contract may control the scope of a duty undertaken by the defendant. In the context of a negligence claim based on an architectural contract, tort liability may arise when the architect negligently fails to perform an express or implied contractual duty. While Nebraska law allows a party to base a claim for nonperformance of a contractual duty on either a contract or tort theory, in both cases the contract may determine the duty which has been breached with resultant liability.

Regarding an architect's duty to inform the client concerning the cost of a proposed project, *Durand* governs only those situations when the architect has agreed to design a project with a specified budget, or when the architect is obligated to furnish an estimate of construction costs. "An architect employed to prepare plans and specifications for a building, with the understanding that the construction would be accomplished

within certain cost limitations, cannot recover compensation for [architectural] services when the building cannot be erected except at a cost materially in excess of the amount specified." *Kleinschmidt, Brassette & Associates v. Ayres*, 368 So. 2d 1153, 1155 (La. App. 1979). See, also, *Kurz v. Quincy Post No. 37, American Legion*, 5 Ill. App. 3d 412, 283 N.E.2d 8 (1972); *Guirey, Srnka & Arnold, Architects v. City of Phoenix, supra*; *Baylor University v. Carlander*, 316 S.W.2d 277 (Tex. App. 1958); *Zannoth v. Booth Radio Stations*, 333 Mich. 233, 52 N.W.2d 678 (1952); 6 C.J.S. *Architects* § 32(b) (1975).

However, when an architect has no express contractual obligation to design a structure within a specified budget or to estimate the construction cost of a proposed project, construction at a cost greater than anticipated by or acceptable to the owner is no defense to an architect's action to recover a fee.

> "[W]here the cost of construction is not fixed in the agreement employing an architect, nor estimated by him, but the plans are prepared according to details dictated by the owner, it has been held that the fact that the plans when completed call for a building which will cost more to erect than the owner expected, or is willing, to pay, will not preclude the architect from recovering compensation for his services in making the plans."

*Guirey, Srnka & Arnold, Architects v. City of Phoenix, supra* at 76, 449 P.2d at 312. "[W]here an architect is employed to prepare plans and specifications for a building and there are no cost limitations agreed upon, such architect can recover compensation for his services irrespective of the costs of construction." *Kleinschmidt, Brassette & Associates v. Ayres, supra* at 1155.

## MOTION FOR JUDGMENT N.O.V.

Hoffman and Miller argue that the district court erred in overruling their motion for relief pursuant to Neb. Rev. Stat. § 25-1315.02 (Reissue 1985):

> Whenever a motion for directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action

to the jury subject to a later determination of the legal questions raised by the motion. Within ten days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict . . . . A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed.

Section 25-1315.02 authorizes entry of a judgment notwithstanding the verdict (n.o.v.) if the appropriate motion is filed within 10 days after reception of the verdict to be set aside. *Dunn v. Hemberger*, 230 Neb. 171, 430 N.W.2d 516 (1988). A motion for judgment n.o.v. may be granted when the movant's previous motion for a directed verdict, made at the conclusion of all evidence, should have been sustained. *Weston v. Gold & Co.*, 167 Neb. 692, 94 N.W.2d 380 (1959).

Upon a motion for directed verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the opposing party. . . . A trial court should direct a verdict . . . only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom.

*In re Estate of Peterson, ante* p. 105, 111, 439 N.W.2d 516, 520 (1989).

"A court cannot decide an issue as a matter of law unless the facts adduced on an issue are such that reasonable minds can draw but one conclusion from the evidence. [Citation omitted.] In a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court can properly direct a verdict on such issue or question."

*Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 850, 438 N.W.2d 485, 489-90 (1989).

Hoffman and Miller moved for a directed verdict at the conclusion of all evidence and sought dismissal of

Getzschman's breach of contract action because "the evidence has established, as a matter of law, a defense to that breach of contract . . . ." Evidence was conflicting on the question whether Hoffmans informed Getzschman that there was a limitation on the cost of construction. Further, Getzschman and Hoffmans excluded the contractual provision concerning the architect's estimate of costs and, thus, made the owner responsible for cost estimating, a situation for which, according to Getzschman, Larry Hoffman had bargained in exchange for Getzschman's more frequent inspections of the construction work. If Hoffmans expressed no budget and the architectural contract placed no obligation on Getzschman for estimating the cost of the project, actual cost of construction in excess of Hoffmans' anticipation does not defeat Getzschman's claim for a fee. The evidence in this case presents a submissible factual question concerning a defense to Getzschman's action for breach of contract. The district court properly overruled the motion by Hoffman and Miller for a directed verdict and, consequently, committed no error in overruling the motion for judgment n.o.v.

## INSTRUCTIONS

Hoffman and Miller also contend that the district court erroneously rejected their tendered instructions on the tort claims embodied in their counterclaim.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the appellant was prejudiced by the court's refusal to give the tendered instruction; (2) the tendered instruction is a correct statement of the law; and (3) the tendered instruction is warranted by the evidence. *Burns v. Veterans of Foreign Wars, supra* at 853, 438 N.W.2d at 491.

Regarding the element of prejudice, this court looks first to the instructions as given, mindful that jury instructions must be read together, and if taken as a whole they correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error upon which a reversal on appeal may be based.

*Zeeb v. Delicious Foods*, 231 Neb. 358, 361, 436 N.W.2d 190, 193 (1989).

Although the court rejected the tendered instructions regarding the tort counterclaims, an instruction was given pertaining to the breach of contract alleged in the counterclaim, that is, Hoffman and Miller were entitled to recover if the jury found that Getzschman's breach of contract caused damage to the counterclaimants. Furthermore, the court instructed the jury that an architect breaches a contract for services by the architect's "underestimating the construction costs of a proposed structure," when there is an agreed budget for the contracted project, and further instructed that an architect has a duty to design a structure for which the construction cost "reasonably approach[es]" the agreed budget, if any. In substance, the court also instructed the jury that an architect has the duty to fully disclose to the owner those important matters which might remain unknown to the owner in the absence of the architect's disclosure. Hoffman and Miller did not object to the court's instruction regarding an architect's duties and failed to suggest any modification or clarification of the instruction given. In the case before us, the issue is performance or nonperformance of a duty, and not the reason underlying alleged nonperformance. The court's instruction on an architect's contractual duties expressed the elements which, if proved, entitled Hoffman and Miller to recover on their counterclaim for tortious breaches of duty by Getzschman. The essence of the tendered instructions on a tortious breach of a common-law duty was substantially expressed in the instruction given concerning breach of a contractually imposed duty. Multiple instructions, utilizing alternative terminology expressing the same basic concepts of duty and breach of duty, were unnecessary.

By its verdict, the jury expressed that Getzschman had performed all his obligations under the contract, including the duties of full disclosure to the owner and restriction of construction cost to an agreed budget, if such budget existed. Therefore, Hoffman and Miller have failed to demonstrate prejudice by the court's refusal to give the tendered instructions on Getzschman's duties under tort law inasmuch as

Getzschman's contractual duties were identical to his duties at common law pertaining to tort liability under the theories advocated by Hoffman and Miller. Inherent in the verdict is the jury's disbelief of the factual basis asserted by Hoffman and Miller for their contract defenses and their contract counterclaim. There is no reason to believe that the jury would have been more receptive to the same factual contentions alternatively characterized as "tort counterclaims." The district court committed no reversible error in rejecting the instructions tendered by Hoffman and Miller.

## EXPERT TESTIMONY

Next, Hoffman and Miller claim that the district court erred by excluding testimony from Gill, an architectural expert, concerning an architect's duties in the course of a contracted project. In the offer of proof, Gill expressed his opinion that an architect has obligations to advise the owner about construction costs and remain within the budget for the project. Also, in Gill's opinion, an architect must inform the owner concerning the probable cost of construction. Gill then expressed his opinion that, assuming the existence of an agreement between Hoffmans and Getzschman concerning a budget of $300,000 to $350,000, Getzschman breached an architect's duty to keep the owner informed of costs and the duties of good faith, loyalty, and full disclosure.

"Admission or exclusion of evidence is a matter for the discretion of the trial court, whose ruling on an evidential question will be upheld unless such ruling constitutes an abuse of discretion." *State v. Olsan*, 231 Neb. 214, 220, 436 N.W.2d 128, 133 (1989).

Although the district court excluded Gill's testimony about an architect's duties in performing a contract to design a structure, the court did instruct the jury that an architect has a duty "to make full disclosures of all matters of which he had or should have knowledge and which it was important that his client should know," that an architect may breach the contract for services by underestimating construction costs if there is an agreed budget, and that the costs of construction must "reasonably approach that stated in the dollar budget unless the

owners order changes which increase the cost of construction." Thus, by correctly instructing the jury regarding an architect's duties involving a budget for a project or the limitation of cost of construction, the court supplied the jury with a statement of law containing and establishing the very facts sought to be proved through Gill's testimony.

Moreover, Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1985), states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

In the light of Rule 702, the question concerning Getzschman's alleged breach of duty based on an agreed budget was properly submitted to the jury without evidence from an expert to assist in determining whether Getzschman "substantially exceeded" any agreed budget. *Durand Associates, Inc. v. Guardian Inv. Co.*, 186 Neb. 349, 183 N.W.2d 246 (1971); *Johannes v. McNeil Real Estate Fund VIII*, 225 Neb. 283, 404 N.W.2d 424 (1987); *State v. Trevino*, 230 Neb. 494, 517, 432 N.W.2d 503, 519 (1988) (" '[E]xpert testimony is admissible only if it will be of assistance to the jury in its deliberations and relates to an area not within the competency of ordinary citizens' "); *In re Interest of D.L.S.*, 230 Neb. 435, 443, 432 N.W.2d 31, 37 (1988) ("Expert evidence is not required to establish matters which are self-evident").

Although expert testimony is, in some circumstances, permitted even in "areas where laymen have competence to determine the facts testified to by the expert," see *Christensen v. City of Tekamah*, 201 Neb. 344, 351, 268 N.W.2d 93, 98 (1978), in each case the first question to be answered by a court considering admissibility of expert testimony under Rule 702 is whether the testimony is likely to assist the trier of fact. *Christensen v. City of Tekamah, supra*; *Priest v. McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985) (Shanahan, J., concurring); *Patch v. Sebelius*, 349 N.W.2d 637 (N.D. 1984); *Lindberg v. Leatham Bros., Inc.*, 693 P.2d 1234 (Mont. 1985); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052 (4th Cir. 1986).

If the jury had believed Larry Hoffman's testimony regarding Getzschman's alleged promises about the cost of constructing the house, the jury was competent to determine whether the $698,000 bid "substantially exceeded" the agreed budget. Gill's testimony was unnecessary to assist the jury in determining whether Getzschman breached an architect's duty concerning the budget for a project and was, therefore, inadmissible. The district court did not abuse its discretion in excluding Gill's testimony.

## DAMAGES

Finally, Hoffman and Miller argue that the awarded damages exceed those which are properly recoverable for breach of the contract in issue and that the district court erred in awarding interest. Hoffman and Miller maintain that Getzschman may recover the appropriate percentage of the cost of the house which was eventually built and may not recover a fee based on the cost of the house designed by Getzschman. The contract clearly provides that Getzschman's fee will be 10 percent of the "Construction Cost as defined in Article 3 of this agreement." Article 3.1.1 provides, "The Construction Cost shall be the total cost or estimated cost to the Owner of all elements of the Project designed or specified by the Architect." Furthermore, article 4.3 of the contract controls Getzschman's compensation in the event the project is not completed as planned:

> When compensation is based on a percentage of Construction Cost, and any portions of the Project are deleted or otherwise not constructed, compensation for such portions of the Project shall be payable to the extent services are performed on such portions, in accordance with the schedule set forth in Subparagraph 9.2.2 based on (1) the lowest bona fide bid or negotiated proposal . . . .

The contract clearly provides that Getzschman's fee is not limited to the cost of actual construction merely because Hoffmans took the final plans to another draftsman for revisions resulting in a lower cost of the house eventually constructed. Getzschman is entitled to a fee based on the "lowest bona fide bid" for "all elements of the Project designed" by Getzschman, namely, a bid of $698,000.

In the architectural contract in issue, paragraph 9.4 states:

Payments due the Architect and unpaid under this Agreement shall bear interest from the date payment is due at the rate entered below, or in the absence thereof, at the legal rate prevailing at the principal place of business of the Architect.

(*Here insert any rate of interest agreed upon.*)

Legal rate in the State of Nebraska.

Under the contract, interest on the amount due the architect is an explicit item of recovery for the architect. The district court did not err in assessing interest at the legal rate prescribed by § 45-102.

Consequently, the judgment of the district court is affirmed.

AFFIRMED.