449 P.2d 306

**GUIREY, SRNKA & ARNOLD, ARCHITECTS, an Arizona corporation, Appellant,**

v.

**CITY OF PHOENIX, a municipal corporation, Appellee.**

**No. 1 CA–CIV 597.**

Court of Appeals of Arizona.

Jan. 21, 1969.

Rehearing Denied Feb. 19, 1969.

Review Denied March 25, 1969.

ipal corporation, for architectural and engineering services rendered as the result of a written agreement between the parties. The court sitting without a jury entered judgment for the City of Phoenix in part as follows:

> "After due consideration of the law and the evidence and the arguments of counsel, the Court being fully advised in the premises, the Court finds that the provisions of Arizona Revised Statutes Section 34–104 preclude recovery for the plaintiff.

> "NOW, THEREFORE, IT IS HEREBY ORDERED ADJUDGED AND DECREED that judgment is hereby rendered in favor of the defendant and against the plaintiff, and the Amended Complaint of the plaintiff is hereby dismissed."

From this judgment as well as the order denying a motion for new trial plaintiffs appeal.

We are called upon to determine:

1. Whether there were two separate contracts, and,

2. if so, was the first contract performed by the plaintiffs.

In reviewing the facts in this case it must be kept in mind that although we must view the evidence in a light most favorable to sustaining the judgment of the trier of fact, McFadden v. Wilder, 6 Ariz. App. 60, 429 P.2d 694 (1967), Consolidated Credit Corporation v. Laurence, 5 Ariz. App. 568, 429 P.2d 455 (1967), with the burden upon the appellant to show that the trial court was in error, Zuniga v. City of Tucson, 5 Ariz.App. 220, 425 P.2d 122 (1967), the Court of Appeals may draw its own legal conclusions from facts found or inferred from the judgment of the trial court and is not bound by findings of the trial court in questions of law or mixed questions of law and fact. Bowen v. Watz, 5 Ariz.App. 519, 428 P.2d 694 (1967), Tovrea Land and Cattle Company v. Linsenmeyer, 100 Ariz. 107, 412 P.2d 47 (1966).

Rawlins, Ellis, Burrus & Kiewit, by Chester J. Peterson, Phoenix, for appellant.

Robert J. Backstein, City Atty., by Edward P. Reeder, Asst. City Atty., for Appellee.

CAMERON, Judge.

This is an action by Guirey, Srnka & Arnold, Architects, an Arizona corporation, against the City of Phoenix, a munic-

At the time the parties entered into the contract in question the following provisions of § 34–104 A.R.S. were in effect:

"§ 34–104. Contract with architect; compensation; rates; submission of proposal; abandonment of proposal

"A. The architect employed shall execute with the agent a contract to prepare working drawings and details and specifications for the proposed project, and to supervise its construction, unless the agent does not employ the architect to supervise the work.

"B. The compensation of the architect shall be:

"1. For preliminary sketches and tentative design, a specified amount, or a commission not to exceed one and one-half per cent of the proposed cost of the project, which shall be deducted from any subsequent commission if further employment is agreed upon.

"2. For complete working drawings, specifications and details, a commission not to exceed four percent of the actual or proposed cost, which shall include payments previously made for preliminary sketches.

\*     \*     \*     \*     \*     \*

"C. No compensation shall be paid an architect, except for preliminary sketches and tentative designs, and then only when special arrangement has been made therefor, until the agent has received, in its judgment, a satisfactory proposal for the project completely finished in accordance with the accepted plans and specifications, the compensation to be within the amount proposed, appropriated or available for the project.

"D. If in the agent's judgment, a satisfactory proposal is not received, then the architect shall revise or redraft the plans as necessary to obtain a satisfactory proposal to construct the project.

"E. If the proposed project is abandoned through no fault of the architect, he shall be compensated upon the percentage provided for in this section."

Subsection B of 34–104 A.R.S. was amended in 1965 by the addition of the following provision:

"4. If the architect provides engineering or other additional services beyond his basic architectural services or has reimbursable expenses, and when special arrangement has been made in advance therefor, he may in addition be reimbursed for such additional services or expense as the agent may approve."

Also, § 34–102 A.R.S., in effect at the time of the contract, read as follows:

"§ 34–102. Employment of architect or engineer for work on public buildings and structures; contract

"A. When authority is given by law to an agent to construct a state, county or other building or structure, or additions to or alterations of existing buildings or structures, an architect or engineer or both, as warranted by the type of construction, shall be employed by the agent if the work is deemed of a nature warranting such employment.

B. When an engineer is employed, the agent may enter into a contract with the engineer, and fix his compensation."

Plaintiff and defendant entered into a contract on 18 January 1962 which read in part as follows:

"For Architectural and Engineering Services with regard to a Municipal Baseball Stadium for the City of Phoenix, to be located at Papago Park, hereinafter called the PROJECT.

\*     \*     \*     \*     \*     \*

"*ARTICLE C—ARCHITECT PROVISIONS:* (Each phase at Owner's option).

*Phase I—Preliminary Site Development studies for the Project develop-*

*ment and Preliminary Planning for expansion areas including:*

(a) Schematics for utilities, parking, traffic circulation and drainage provisions for the entire site to determine most feasible extent of initial construction. These to be developed in conjunction with Owner-furnished information provided under Article B.

(b) General siting of stadium and playing field.

(c) Construction cost estimate for the Project.

Note: Work under this Phase is not intended to serve as working drawings for construction.

*Phase II—Stadium Preliminaries:*

(a) Preliminary plans, elevations, details and outline specifications required for Owner to determine financing of the stadium.

(b) Perspective rendering (black and white) to indicate general character of stadium and adjacent areas, original to become property of Owner except per Paragraph D (6), page 5.

(c) Preliminary estimate on the cost of the stadium construction.

*Phase III—Contract Documents:* (Working Drawings and Specifications)

To be commenced only upon written 'Notice to Proceed' following approval of all or portions of Phase I and/or Phase II. * * *."

Article D of the contract provided that plaintiffs were to receive a fee of 1½% of the estimated cost of construction for Phase I, an additional 1½% for Phase II, and for Phase III a sum sufficient to bring the total fee to 4½% of the low bid for construction of the stadium and a sum equal to 6% for site development work.

A reading of the contract leads to the conclusion that the agreement called for more than is encompassed by the statute in question. § 34–104 A.R.S. is limited to architectural service only while the contract in question called for engineering as well as architectural work, and although the Arizona legislature felt it necessary to amend the statute to provide that the architect could provide "engineering or other additional services" and be compensated therefor, we find nothing in § 34–104 A.R.S. in effect at the time of the contract which prevented the parties from agreeing to engineering and other services in addition to architectural services. Thus, Phase I of the contract called for site development, parking, and traffic circulation. Phase II of the contract corresponds roughly to subsec. B(1) of § 34–104 and Phase III corresponds roughly to subsec. B(2) of § 34–104 A.R.S. We will presume that both the City of Phoenix and plaintiffs intended and did enter into a legally binding contract within the provisions of the then existing statutes including § 34–104 A.R.S.

The contract was silent as to any cost restriction or availability of funds. Prior to entering into the contract the plaintiffs were furnished with "Reports from Municipal Stadium Subcommittee" which included an estimated total cost figure of $710,205 (engineering costs or contingencies not included) and a breakdown of the source of funds, to wit: estimated amount received from the sale of the old stadium, $260,000, which, when subtracted from the total estimated cost, left $450,205 as the net additional city funds required for the project. During the period of time that plaintiffs were preparing the plans, discussions were held and letters exchanged between the parties concerning the cost and the funds available, but nowhere have we been able to find wherein the parties agreed that the plans were to provide facilities that could be constructed for a definite amount and the contract is silent in this regard.

Plaintiffs then began work on the necessary preliminary drawings for the stadium facility and on 12 April 1962 they delivered 4 sets of plans for the defendant. On 18 April 1962 the plaintiffs sent defendant a letter outlining various changes and recom-

mending certain deletions. Also, a breakdown of the total estimated cost of $831,-398.11 (exclusive of architect and engineering fees) was included in the letter. The defendant was accordingly billed 2 May 1962 for services performed on Phase I and based on the estimate of $831,398.11 and on 22 May 1962 the City Council authorized this payment. A city progress report dated 19 May 1962 indicated that the estimate of $831,398.11 had been revised downward to $750,000. The report further stated that now $740,000 would be available, but since $107,000 had already been spent, leaving a balance of $633,000 for the project, "approximately $120,000 should be budgeted so that a usable facility will be available."

On 11 June 1962 a memorandum from Mr. Glendening, Public Works Director, to Mr. Vickers, City Manager, with a copy to plaintiffs, pointed out that since the City Council and Stadium Committee had approved the plans the City was going to authorize the plaintiffs to proceed with the working drawings. (Phase III of the contract.) Three days later Mr. Glendening gave the plaintiffs formal "notice to proceed" with the working drawings.

The plaintiffs were requested 21 June 1962 by the defendant to provide $50,000 to $60,000 worth of deductible alternatives.

By 23 July 1962 the total estimated costs had reached $963,978 as reflected by a letter from Glendening to Vickers. This amount was $208,978 more than the available funds. In an effort to reduce the cost of the stadium, deductive alternatives in the amount of $45,500 were provided. The changes though "were deemed necessary to have a workable facility which could adequately serve an expanded stadium without costly revisions and additions at a later date." Mr. Glendening though concluded "that since we are still dealing with estimates, we be allowed to proceed with the advertising for the construction of the stadium."

The bids were advertised on 24 July 1962 by the defendant. The bids were opened on 5 September 1962. The low bid was received from Valcon Builders for $790,282. The defendant then requested plaintiffs, by letter from Glendening, to prepare a report outlining items which could be eliminated in order to reduce the construction costs. Mr. Glendening concluded:

"As I see this matter, we have a mandate from the Council to build a Stadium with the funds now apparently available. It appears this will require elimination of all but necessities."

The letter further pointed out that the maximum cost of the stadium should not exceed about $532,300.

After the parties were unable to reduce the cost satisfactorily on the first stadium, plaintiffs submitted a second stadium design which was different than the first. This was the stadium that was finally built by the defendant. The plaintiffs billed defendant for the second stadium on the basis of the terms of the contract for the first stadium. Plaintiffs were paid on this basis for the second stadium less any payments received on the first stadium. Plaintiffs instituted this action to recover for services performed on stadium number one as per written contract.

## WERE THERE TWO CONTRACTS?

It is the contention of the defendant-appellee, City of Phoenix, that there was only one contract and that the second stadium designed by the plaintiffs was at most a revision or redraft of the plans originally submitted. It is also appellee's further contention that a satisfactory proposal was never received by the City as to the first stadium and that under A.R.S. § 34–104, subsec. D the plaintiffs were obligated to provide this revision or redraft. It is true that we have only one contract before us—the one sued upon. That there may have been a second contract, even though oral, is not our concern. We must first ask whether there was in fact two different stadiums or merely a modification of the first stadium. We have before us the two sets of

plans. They are very extensive. We believe it is significant that the first plans consisting of 59 pages showed on the title page:

"Approvals

| "/s/ | A. Morgan Johnson<br>Assistant City Engr. Design | 8–10–62<br>Date |
| /s/ | J. E. Attebery<br>Assistant City Engr. Constr. | 8–10–62<br>Date |
| /s/ | Sam Tucker<br>City Engineer | 10 Aug. 62<br>Date |
| /s/ | Fred S. Glendening<br>Director of Public Works | 10 Aug. 62<br>Date " |

———————◆———————

These plans were accompanied by specifications consisting of some 136 pages. Plaintiffs made revisions of these plans but pointed out in a letter to Mr. Fred Glendening, Director of Public Works, on 30 October 1962, after a low bid had been considered by the City Council to be in excess of the funds available:

"However, our work has been performed well and in good faith and for which we should now be paid. Per our Agreement we are obligated to make reasonable revisions to the Documents to adjust to the current budget for construction. Such revision will be at no additional cost to the City. *('Reasonable Revisions' does not imply a major re-design.)*" (Emphasis ours.)

The letter accompanying the preliminary studies for the second baseball stadium which letter was dated 9 January 1963 reads in part as follows:

"Dear Mr. Glendening:

"Attached herewith are completed Preliminary studies of a new concept of the Baseball Stadium, dated December 28, 1962."

The testimony of the Mayor of Phoenix on examination by the plaintiffs' attorney was as follows:

"Q And at that time the old plan was abandoned and the new plan was adopted, is that true?

"A Yes.

"Q And the City was well aware of the fact that the old plan was being dropped and abandoned and that it would take a new bunch of preliminary plans and schematics and the complete follow through as had been done on the first stadium, didn't they?

"A Yes.

"Q And notwithstanding they knew this, they told Guirey, Srnka & Arnold to go ahead with the new concept, didn't they?

"A Yes.

"Q At that time isn't it true also that you had been advised by Mr. Glendening that Guirey, Srnka & Arnold were claiming an unpaid fee of something in the neighborhood of $31,000?

"A Yes.

"Q And this was discussed by the City Council prior to the time that the go-ahead was given for the new stadium, isn't that true?

"A Yes.

"Q And at that time isn't it true the City Council sort of held it in abeyance or did they deny the claim, do you know?

"A Yes, I believe that the Council proceeded on the basis that the architects, under the contract, were ob-

ligated to deliver plans and specifications that would be put out to bid and the bid brought within the allowable estimate.

\* \* \* \* \* \*

"Q All I'm asking now, Mr. Mardian, is whether or not you were aware of the fact and did Mr. Glendening make the City Council aware of the fact that Guirey, Srnka & Arnold had agreed to make reasonable revisions to Stadium Number 1, but had stated that if they made a major redesign, they would expect to be paid for it in addition to the contract price for Stadium Number 1?

"A I believe that the Council was made aware of that, yes, however, I also believe that it was stated by the City Attorney's office that we could ask them to redraw the plans so the bids could be taken within the allowable estimate."

■ It is apparent from the exhibits before us that there were in fact two distinct and separate plans for the stadiums and that the second stadium was not merely a revision of the first stadium.

### WAS THE FIRST CONTRACT PERFORMED BY THE PLAINTIFFS?

It is the contention of the City that the bid being higher than available funds that a "satisfactory proposal" was not received and therefore the City is precluded from paying the amount due on the contract. With this we do not agree.

■ It is true that when the architect and owner specifically agree that the bid or costs shall not be over a certain amount the architect may be denied compensation if the cost or bid is substantially over the amount agreed upon. 5 Am.Jur.2d, § 18, page 681, 6 C.J.S. Architects § 14, page 310. Bruno v. Gauthier, La.App., 70 So.2d 693 (1954), Goodrich v. Lash, 121 Vt. 15, 146 A.2d 169 (1958), Cooper v. City of Derby, 83 Conn. 40, 75 A. 140 (1910), Stevens v.

Fanning, 59 Ill.App.2d 285, 207 N.E.2d 136, 20 A.L.R.3d 769 (1965). However, to deny the architect recovery there must be a showing that the parties specifically agreed to the amount or cost limitations. Such is not the case here. Nowhere in the contract or elsewhere do we find a specific cost limitation. Instead, we see the City leading the architect on, mentioning the possibility of additional funds and generally doing everything but giving the architect a definite cost limitation. It has been stated:

"And where the cost of construction is not fixed in the agreement employing an architect, nor estimated by him, but the plans are prepared according to details dictated by the owner, it has been held that the fact that the plans when completed call for a building which will cost more to erect than the owner expected, or is willing, to pay, will not preclude the architect from recovering compensation for his services in making the plans." Pocket Part, 1957, 3 Am.Jur., § 15, page 219, citing Clark v. Smith, 234 Wis. 138, 290 N.W. 592, 127 A.L.R. 406.

And:

"We conclude from the evidence as a whole that there was never any agreement that a cost limitation be placed on the proposed building, but only an approximation of such estimated cost.

"It was at the September, 1955, meeting that cost became a controlling factor, but by this time most, if not all of the work, for which plaintiff sued, had been done.

"In Hall v. Parry, 55 Tex.Civ.App. 40, 118 S.W.2d 561, er. ref., it was held that unless the architect is given clear instructions with regard to maximum cost, it is not the architect's province to keep himself informed as to the financial ability of his client." Texas Delta Upsilon Foundation v. Fehr, (Tex.Civ.App.), 307 S.W.2d 124, 131, 132 (1957).

We believe that the fact that the bid was higher than the City expected is not sufficient to enable the City to claim that a satisfactory offer was not received.

Subsections C, D & E of 34–104 A.R.S. provide that the agent must receive a satisfactory proposal before payment can be made. If a satisfactory proposal is not received the architect shall revise or redraft as necessary to obtain a satisfactory proposal. The plaintiffs continued with redrafts and revisions until it was obvious that the project was abandoned. The evidence is clear that the City abandoned the project and did so through no fault of the plaintiffs. Both by contract and statute plaintiffs are entitled to compensation.

If we were to affirm the lower court we would be saying, in effect, that all a city has to do to avoid compensating an architect under § 34–104 A.R.S. is to find that the proposal is unsatisfactory. Such a ruling would allow cities to hire architects at will to design any number of speculative buildings, but avoid compensating the architect when the city determines there is not enough funds to pay for the construction even though they were aware, as herein, that the estimated cost was above the funds available.

While we fully realize that a city should not be required to compensate an architect who fails to provide a satisfactory proposal, we do not believe the legislature intended that this power be exercised in such fashion as here. We therefore hold that where a city invokes subsection C it must exercise its judgment in a reasonable manner before the court should be allowed to give effect to the rejection.

We do not believe that § 34–104 A.R.S. precluded recovery by the plaintiffs. The matter must therefore be remanded to determine the amount due the plaintiffs on the first contract.

Reversed and remanded with directions to enter judgment for the plaintiffs in an amount to be determined by the trial court consistent with this opinion.

DONOFRIO, C. J., and STEVENS, J., concur.