96 P.3d 1070

**WESTERN CORRECTIONS GROUP, INC., a Wyoming corporation, Plaintiff–Appellant,**

v.

**David TIERNEY and Jane Doe Tierney, husband and wife, and Sacks Tierney, P.A., a professional association, Defendants–Appellees.**

No. 1 CA–CV 03–0001.

Court of Appeals of Arizona, Division One, Department C.

Aug. 31, 2004.

Thomas & Elardo, P.C., Phoenix, By John A. Elardo, Neal B. Thomas, for Plaintiff–Appellant.

Lewis and Roca LLP, Phoenix, By Peter D. Baird, Robert G. Schaffer, Jason C. Furedy, for Defendants–Appellees.

## OPINION

TIMMER, Presiding Judge

¶ 1 Arizona Revised Statute ("A.R.S.") section 11–254.01(A) (2001) requires counties to procure contractual services over a specified dollar value, other than professional services, by sealed, competitive bids. To decide the appeal in this legal malpractice case, we must delineate the "professional services" that are exempt from the competitive bid requirement. After resolving that issue and others, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶ 2 On July 15, 1996, La Paz County and appellant Western Corrections Group, Inc. ("WCG") entered in a "Project Expediter Agreement" ("Agreement"), whereby WCG agreed to assist the County Supervisors and serve as their agent "in planning, designing, contracting, implementing and constructing" two County facilities and "by selecting and expediting the work of an architect and/or engineer and contractor for the Project." The County did not submit the Agreement for competitive bid. WCG is operated by Wesley Box, who signed the Agreement as WCG's authorized agent. Neither WCG nor Box was licensed as a contractor, engineer, or architect.

¶ 3 The Agreement segregated WCG's duties into three stages: planning, bidding, and construction. WCG was required to pay all costs, fees, and expenses incurred in performing its duties. In return for WCG's services, the County agreed to compensate WCG by paying it 13% of the total construction costs for the facilities, which the County would pay pursuant to a payment schedule set forth in the Agreement. The schedule also required the County to pay WCG $1,000 upon execution of the Agreement, which the County paid on July 15, 1996.

¶ 4 During the planning stage of the project, WCG procured architectural plans and specifications to be used in a project bid package and submitted them to the County. The County Board of Supervisors subsequently accepted the bid package and authorized payment of $360,000 to WCG pursuant to the terms of the payment schedule. Consequently, on November 12, 1996, the County issued WCG a $360,000 warrant for payment. On November 21, however, the county treasurer refused to honor the warrant. Thereafter, WCG hired appellee David Tierney and Sacks Tierney, P.A. (collectively, "Tierney"), to represent it in an attempt to collect on the warrant.

¶ 5 On December 24, Tierney filed a complaint in federal district court for mandamus relief against the county treasurer, seeking to compel payment of the $360,000 warrant. The district court later dismissed the complaint for failure to join the County as an indispensable party.

¶ 6 On September 2, 1997, a newly elected Board of Supervisors, which questioned the legality of the Agreement, voted to cancel the Agreement and rescind the warrant. Thereafter, the County returned the plans and specifications to WCG, the facilities were never built, and no construction costs were incurred.

¶ 7 On May 13, 1998, Tierney sent a notice of claim to the County pursuant to A.R.S. § 12–821.01 (2003), which requires a person with a claim against a public entity or a public employee to provide notice of that claim within 180 days of the date the claim accrued. Failure to comply with this provision bars any claim. *Id.* at § 12–821.01(A).

¶ 8 On September 9, the County filed a complaint in superior court seeking a declaration of the parties' rights under the Agreement. WCG counterclaimed for breach of contract and quantum meruit. The court eventually dismissed WCG's counterclaim because WCG, through Tierney, had failed to timely file a notice of claim as required by A.R.S. § 12–821.01(A). As a result, WCG sued Tierney for professional negligence (legal malpractice), breach of fiduciary duty, and fraud, and sought both compensatory and punitive damages.

¶ 9 The trial court granted partial summary judgment in favor of Tierney. The court ruled that WCG would have lost its

case against the County because the Agreement was unenforceable due to the County's failure to comply with applicable statutory provisions, and WCG was not otherwise entitled to receive compensation from the County. Consequently, the court determined that WCG could not recover any damages for legal malpractice based on its contention that it would have prevailed against the County but for Tierney's failure to timely submit the notice of claim. The court further found that the evidence did not support a punitive damages award. After the court's ruling, the claims remaining for trial concerned only whether WCG was entitled to recover attorneys' fees and costs expended to pursue its claim against the County after expiration of the 180–day time limit to file a notice of claim.

¶ 10 Prior to trial, Tierney voluntarily paid $83,709.28 to WCG, representing attorneys' fees and costs expended by WCG for actions taken after the expiration of the 180–day time limit. A jury subsequently found in favor of WCG on the negligence and fraud claims, but against it on the breach of fiduciary duty claim. The jury assessed damages in the amount of $83,709.28. Upon Tierney's motion, the court entered judgment as a matter of law in favor of Tierney on the fraud claim. Additionally, the court credited Tierney with the pretrial payment, thereby reducing the damages verdict to zero. After entry of judgment, this appeal followed.[1]

## DISCUSSION

¶ 11 To prevail on its legal malpractice claim, WCG was required to show that but for Tierney's failure to timely file a notice of claim, WCG would have been successful in the "case within the case," which was WCG's lawsuit against the County. *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 131, 907 P.2d 506, 517 (App.1995) ("To recover compensatory damages in a legal malpractice action the plaintiff must prove that but for the attorney's negligence, the prosecution or defense of the orig-

inal action would have been successful."). We review de novo the trial court's grant of partial summary judgment on this issue, viewing the evidence in the light most favorable to WCG as the non-prevailing party. *L. Harvey Concrete, Inc. v. Agro Constr. & Supply Co.*, 189 Ariz. 178, 180, 939 P.2d 811, 813 (App.1997). The court properly entered partial summary judgment for Tierney if no genuine issues of material fact existed, and he was entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c); *Orme School v. Reeves*, 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990).

¶ 12 WCG argues that the trial court erred by ruling as a matter of law that WCG would have lost its case against the County because (1) the Agreement was not void due to statutory violations, (2) even if one or more violations occurred, the County was estopped from relying on these provisions to void the Agreement, and (3) alternatively, WCG was entitled to recover damages in quantum meruit. We address each contention in turn.

### A. Statutory violations

¶ 13 The trial court ruled that the Agreement was void and thus unenforceable because (1) A.R.S. § 11–254.01(A) required the County to submit the project expediter job for competitive bid, and (2) contrary to the terms of the Agreement, A.R.S. §§ 34–102(A),—104(A) (2000 & Supp.2003) required the County to directly employ and contract with the project architect and engineer. A public contract entered in violation of a statute is invalid and unenforceable. *Mohave County v. Mohave–Kingman Estates, Inc.*, 120 Ariz. 417, 420, 586 P.2d 978, 981 (1978); *Ariz. Bd. of Regents ex rel. Univ. of Ariz. v. Main St. Mesa Assocs.*, 181 Ariz. 422, 429, 891 P.2d 889, 896 (App.1994) (holding that failure to follow the competitive bidding statutes for the sale of state lands is "void *ab initio* and can never be the basis for an agreement"). WCG does not contest this general principle but contends that the

1. By separate unpublished decision filed this date, we address additional issues raised on appeal that are not relevant to our analysis in this opinion and do not meet the standards of publi-

cation set forth in Arizona Rule of Civil Appellate Procedure 28(b). *Fenn v. Fenn*, 174 Ariz. 84, 85, 847 P.2d 129, 130 (App.1993).

Agreement did not violate any statutory provision.

¶ 14 Section 11–254.01 provides as follows:

A. All purchases of supplies, materials, equipment and contractual services *except professional services*, made by the county having an estimated cost in excess of ten thousand dollars per transaction ... shall be based on sealed, competitive bids.

. . .

D. Professional services shall be procured pursuant to written policies developed by the county purchasing agent and adopted by the board of supervisors.

(Emphasis added.) As with all competitive bid statutes, the purpose of § 11–254.01(A) is to prevent favoritism, fraud and public waste by encouraging free and full competition, and to secure the best work for the lowest, practicable price. *Achen–Gardner, Inc. v. Superior Court,* 173 Ariz. 48, 52, 839 P.2d 1093, 1097 (1992); *Main St. Mesa Assocs.,* 181 Ariz. at 426, 891 P.2d at 893.

¶ 15 The County did not submit the project expediter job for competitive bid. WCG argues, however, that competitive bidding was not mandated because a project expediter provides "professional services," which are exempted under § 11–254.01(A). Tierney, not surprisingly, takes the opposite view. Because the legislature did not define "professional services," we employ accepted principles of statutory construction to discern the meaning of the term.

¶ 16 The cardinal rule of statutory interpretation is to ascertain the legislature's intent in adopting the provision. *City of Phoenix v. Superior Court,* 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984). To determine the legislature's intent in enacting § 11–254.01, we look first to the provision's language, *Calmat of Ariz. v. State ex rel. Miller,* 176 Ariz. 190, 193, 859 P.2d 1323, 1326 (1993), and will ascribe plain meaning to its terms unless the legislature assigned a special meaning to one or more terms. *State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). If the legislative intent is unclear, we then employ other methods of stat-

utory construction. *Bilke v. State,* 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 271 (2003).

¶ 17 To determine the plain meaning of a term, we refer to established and widely used dictionaries. *State v. Wise,* 137 Ariz. 468, 470 n. 3, 671 P.2d 909, 911 n. 3 (1983). According to Black's Law Dictionary 1226 (7th ed.1999), a "professional" is "[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency." Similarly, Webster's New Universal Unabridged Dictionary 1437 (2d ed.1993) defines a "professional," in significant part, as a person belonging to "a vocation or occupation requiring advanced training in some liberal art or science, and usually involving mental rather than manual work, as teaching, engineering, writing, etc.; especially, medicine, law, or theology."

¶ 18 Adoption of these definitions is supported by the limited legislative history for § 11–254.01(A). *Yslava v. Hughes Aircraft Co.,* 188 Ariz. 380, 385, 936 P.2d 1274, 1279 (1997) (stating court should interpret unclear statutes to conform with general goals expressed in legislative history). No legislative history exists explaining why the legislature originally exempted professional services from the bid requirements of § 11–254.01 when that provision was enacted in 1983. However, prior to amending that provision in 1987 to increase the threshold amount that triggers the bid requirements, the House Committee on Counties and Municipalities engaged in a lengthy discussion of the professional services exemption and referred to the difficulties encountered in evaluating bids from "doctors, lawyers, etc." *Arizona House of Representatives Minutes of Committee on Counties & Municipalities: Consideration of H.B. 2123,* 38th Leg., 1st Reg. Sess., at 2 (Ariz.1987).

¶ 19 An interpretation of "professional services" that focuses on specialized education, training, and predominant use of intellectual skills is also consistent with usage of the term in the state procurement code. *State v. Thomason,* 162 Ariz. 363, 366, 783 P.2d 809, 812 (App.1989) ("A statute should be explained in conjunction with other statutes which relate to the same subject or have the same general purpose."). Specifically, the

state procurement code exempts from competitive bidding and establishes procedures for obtaining "professional services" from clergy, certified public accountants, legal counsel, physicians, and dentists. A.R.S. §§ 41–2513, –2532, –2538 (2004). Similarly, the code sets forth non-bid procedures for obtaining "professional services" from architects, engineers, land surveyors, assayers, geologists, and landscape architects. A.R.S. §§ 41–2571, –2578 (2004).

¶ 20 Based on the foregoing, we conclude that the term "professional services," as used in A.R.S. § 11–254.01, refers to those services rendered by a person engaging in a recognized discipline that necessarily requires advanced training and specialized knowledge to perform. Such services also typically result from the predominant use of intellectual skills rather than physical skills. Our interpretation is consistent with those employed by other courts and authorities.[2] Bearing this definition in mind, we now decide whether a project expediter renders "professional services" so as to exempt that job from the bid requirements of § 11–254.01(A).

¶ 21 In determining whether a service is a professional one, we look at the nature of the involved acts rather than the title afforded the actor. *W.H. Opie,* 663 F.2d

at 981 (citing *Marx,* 183 Neb. at 14, 157 N.W.2d at 872). After examining the record, we agree with the trial court that the project expediter services encompassed within the Agreement were not professional services. WCG's duties essentially consisted of procuring services necessary to plan, design, and construct two facilities and then serving as a liaison between the County and retained architects, engineers, and contractors. WCG was not charged with creating plans or specifications for the facilities. Indeed, Box testified that he served as a facilitator and assistant to the County. Regardless of WCG's proficiency in performing its tasks, the record does not reflect that WCG labored within a discipline that necessarily required advanced training and specialized knowledge to perform. Consequently, we decide that the project expediter job was not exempt from the bidding requirements of A.R.S. § 11–254.01 as a professional service.[3] Because the County did not bid this job, the trial court correctly ruled that the Agreement executed with WCG was void. *Main St. Mesa Assocs.,* 181 Ariz. at 429, 891 P.2d at 896. In light of our decision, we need not decide whether the trial court correctly entered partial summary judgment based on violations of A.R.S. §§ 34–102(A), and –104. Likewise, we need not address the parties' arguments

2. The definition of "professional service" commonly employed in other jurisdictions originated in *Marx v. Hartford Accident & Indem. Co.,* 183 Neb. 12, 14, 157 N.W.2d 870, 872 (1968), which held, in pertinent part and in the context of construing an insurance policy, that "[a] 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *See, e.g., Curtis Ambulance of Fla., Inc. v. Bd. of County Comm'rs,* 811 F.2d 1371, 1379–80 (10th Cir.1987) (employing *Marx* definition to hold that emergency medical technicians and mobile intensive care technicians render "professional services" so as to exempt job from competitive bid requirement); *Bank of Cal. v. W.H. Opie,* 663 F.2d 977, 980–81 (9th Cir.1981) (using *Marx* definition in insurance coverage context); *Overland Constructors, Inc. v. Millard Sch. Dist.,* 220 Neb. 220, 229, 369 N.W.2d 69, 75–76 (1985) (using definition to conclude that architects render professional services); Op. Ariz. Att'y Gen. I89–048 (advising state auditor general to use similar definition in applying

§ 11–254.01); Pima County, Ariz., Gen. Ordinances § 11.04.030(R) (2002) (applying similar definition of "professional services" in Arizona county procurement code); Maricopa County, Ariz., Procurement Code § MC1–203(C) (1999) (listing as "professional services" for purposes of Arizona county procurement code such occupations as attorneys, physicians, architects, and teachers).

3. WCG cites to *Dana, Larson, Roubal & Assoc. v. Bd. of Comm'rs,* 124 Idaho 794, 864 P.2d 632 (App.1993) as upholding a similar contract between WCG and an Idaho county. We are not persuaded to follow that case because it involved a statute exempting "personal services" as opposed to professional services from the bidding requirements. *Id.* at 800–01, 864 P.2d at 638–39. Moreover, the court there concluded that WCG "appear[ed] to have contracted to perform architectural services ... such as developing preliminary plans." *Id.* at 801, 864 P.2d at 639. The record before us established that Box, acting on behalf of WCG, did not develop plans, but merely hired the architect who did.

concerning WCG's entitlement to compensation under the payment provisions contained within the Agreement.

## B. Equitable Estoppel

¶ 22 The trial court rejected WCG's alternative argument that the County was precluded by principles of equitable estoppel from denying the validity of the Agreement. Specifically, WCG asserted that because the County's attorney drafted the Agreement, and the board of supervisors approved it, the County was estopped from avoiding the Agreement due to any statutory violations. The court disagreed, ruling that WCG was not entitled to rely on equitable estoppel because the Agreement was illegal and the county facilities were not constructed.

¶ 23 Although a governmental entity is not generally subject to equitable estoppel, the defense can apply under the following circumstances: (1) the government engaged in affirmative conduct inconsistent with a position it later adopted that is adverse to the claimant, (2) the claimant actually and reasonably relied on the government's prior conduct, (3) the government's repudiation of its prior conduct caused the claimant to suffer a substantial detriment because it changed its position in a way not compelled by law, and (4) applying estoppel against the government would neither unduly damage the public interest nor substantially and adversely affect the exercise of governmental powers. *Valencia Energy Co. v. Ariz. Dep't of Revenue,* 191 Ariz. 565, 576–78, ¶¶ 35–40, 959 P.2d 1256, 1267–69 (1998); *Luther Constr. Co. v. Ariz. Dept. of Revenue,* 205 Ariz. 602, 604–05, ¶ 11, 74 P.3d 276, 278–79 (App.2003). For the reasons that follow, we conclude that equitable estoppel did not apply against the County because to do so would have unduly damaged the public interest.

¶ 24 Our courts have regularly held that equitable estoppel cannot apply to enforce a contract that is void as against public policy. *Clark v. Tinnin,* 81 Ariz. 259, 263–64, 304 P.2d 947, 950 (1956); *Red Rover Copper Co. v. Indus. Comm'n of Ariz.,* 58 Ariz. 203, 214, 118 P.2d 1102, 1107 (1941); *Main St. Mesa Assocs.,* 181 Ariz. at 430, 891 P.2d at 897;

*Peterson v. Anderson,* 155 Ariz. 108, 113, 745 P.2d 166, 171 (App.1987); *Oracle Sch. Dist. No. 2 v. Mammoth High Sch. Dist. No. 88,* 130 Ariz. 41, 44, 633 P.2d 450, 453 (App.1981); *see also* 10A Eugene McQuillin, The Law of Municipal Corporations § 29.104.30, at 70 (3d ed. 1999) ("[N]o ratification or estoppel can make lawful a municipal contract which is beyond the scope of the corporate powers, or which is not executed in compliance with mandatory conditions prescribed in the charter or statutes, or which is contrary to a declared policy adopted to protect the public."). To permit recovery of the full contract price under a theory of equitable estoppel would eradicate the principle that public contracts entered in violation of a statute are invalid and unenforceable. *Mohave–Kingman Estates, Inc.,* 120 Ariz. at 420, 586 P.2d at 981; *Main St. Mesa Assocs.,* 181 Ariz. at 429, 891 P.2d at 896.

¶ 25 As previously stated, ¶ 21 *supra,* the Agreement between the County and WCG was void because the County failed to submit the project expediter job for public bid, as mandated by A.R.S. § 11–254.01. For this reason alone, equitable estoppel could not be invoked to resurrect the Agreement. *See supra,* ¶ 24. Indeed, as the purpose of § 11–254.01 is to prevent favoritism, fraud and public waste, *Achen–Gardner, Inc.,* 173 Ariz. at 52, 839 P.2d at 1097, allowing WCG to enforce a void contract under the theory of equitable estoppel would entirely frustrate the public protection afforded by competitive bidding. *Blum v. City of Hillsboro,* 49 Wis.2d 667, 676–77, 183 N.W.2d 47, 52 (1971) (holding contractor not entitled to recover moneys under theory of equitable estoppel for work performed in violation of competitive bidding statute as to do so would impair protection afforded by statute); *see also Ballew v. Town of Priceville,* 771 So.2d 1040, 1042–43 (Ala.2000) (concluding equitable estoppel cannot apply to preclude city's defense of noncompliance with competitive bid law). In light of the foregoing, we hold that WCG was not entitled to invoke equitable estoppel against the County to enforce the Agreement as to do so would have unduly damaged the public interest.

## C. Quantum Meruit

■ ¶ 26 WCG finally contends that the trial court erred by ruling that WCG would not have recovered moneys from the County under a theory of quantum meruit. The court ruled that WCG would not have prevailed on this theory because the County cancelled the Agreement and WCG never completed the work. WCG argues that it was not required to have completed its duties under the Agreement in order to have received the value of its services in hiring an architect and paying that person to draft plans and specifications for the County facilities. Tierney counters that quantum meruit damages are not recoverable on a void public contract or, alternatively, such damages were not available to WCG because the County did not retain the submitted plans and specifications.

■ ¶ 27 "Quantum meruit" is the measure of damages imposed when a party prevails on the equitable claim of unjust enrichment. *Landi v. Arkules*, 172 Ariz. 126, 135, 835 P.2d 458, 467 (App.1992). To recover such damages, the party must prove that (1) the other party was unjustly enriched at the expense of the claimant, (2) the claimant rendered services that benefitted the other party, and (3) the claimant conferred this benefit under circumstances that would render inequitable the other party's retention of the benefit without payment. *Id.* Quantum meruit damages are available when services are performed under an unenforceable contract or when they are rendered in the absence of a contract. *Blue Ridge Sewer Improvement Dist. v. Lowry and Assocs., Inc.*, 149 Ariz. 373, 375, 718 P.2d 1026, 1028 (App. 1986).

■ ¶ 28 We reject Tierney's contention that quantum meruit damages are never recoverable for performance of a void public contract. Arizona, unlike many jurisdictions, does not impose a blanket prohibition on the recovery of such damages. *Id.; see also Town of Holbrook v. Girand*, 52 Ariz. 291, 297, 80 P.2d 695, 698 (1938) (holding engineer entitled to recover quantum meruit damages for services rendered under illegal municipal contract); *Yuma County v. Hanneman*, 42 Ariz. 561, 567–69, 28 P.2d 622, 624–25 (1934)

(affirming damages award under quantum meruit doctrine for sale of goods to county even though competitive bid provision not followed); *Greenlee County v. Webster*, 30 Ariz. 245, 250–52, 246 P. 543, 545 (1926) (concluding contractor entitled to recover in quantum meruit even though excess work performed in violation of competitive bid provision). Thus, if WCG was able to establish the elements of unjust enrichment, it was entitled to recover quantum meruit damages from the County.

■ ¶ 29 We agree with Tierney's alternative contention that WCG would not have prevailed on its unjust enrichment claim against the County because the County did not retain any benefit bestowed by WCG. WCG argues that it conferred a compensable benefit on the County by providing it with architectural plans and specifications to be used in bid packages for the proposed construction projects. But the County returned the plans and specifications to WCG, cancelled the construction projects, and never built the proposed facilities. Although WCG suggests that the County used the plans and specifications in deciding not to pursue the projects, it does not cite any evidence to that effect. " 'Restitutionary relief is allowable only when it would be inequitable or unjust for defendant to *retain* the benefit without compensating plaintiff.' " *Creative Learning Sys., Inc. v. State*, 166 Ariz. 63, 66, 800 P.2d 50, 53 (App.1990) (citing *Murdock–Bryant Constr., Inc. v. Pearson*, 146 Ariz. 48, 54, 703 P.2d 1197, 1203 (1985)) (emphasis added); *see also City of Sierra Vista v. Cochise Enters., Inc.*, 144 Ariz. 375, 381, 697 P.2d 1125, 1131 (App.1984) (stating that unjust enrichment occurs when a person has and retains benefits that in justice and equity belong to another). Because the record does not reflect that the County used, retained, or benefitted from WCG's plans and specifications, the trial court correctly ruled that WCG was not entitled to recover the reasonable value of its services under the doctrine of quantum meruit.

¶ 30 WCG mistakenly relies on *Guirey, Srnka & Arnold, Architects v. City of Phoenix*, 9 Ariz.App. 70, 77, 449 P.2d 306, 313

(1969), to support its contention that the County could not avoid paying the reasonable value of WCG's services by simply canceling the construction projects. In *Guirey*, the City of Phoenix refused to compensate an architect for a stadium design drawn under the terms of a written contract between the parties. *Id.* at 71, 449 P.2d at 307. The city claimed that the stadium design was too costly to build and thus "unsatisfactory" under A.R.S. § 34–104(C), which permitted the city to withhold payment until receipt of a satisfactory proposal finished in accordance with accepted plans and specifications. *Id.* at 76–77, 449 P.2d at 312–13. This court reversed the trial court's judgment in favor of the city, holding that because the agreement did not include a building cost limitation, and the architect prepared the plans according to the details dictated by the city, the terms of the contract and § 34–104 required the city to pay the architect even after the city abandoned the project as reflected in the design. *Id.* The court's holding was chiefly premised on the contractual obligations of the parties and did not discuss or mention quantum meruit. Because WCG and the County did not enter into a valid contract, and no statute mandates payment to WCG, *Guirey* is inapplicable.

## CONCLUSION

¶ 31 For the foregoing reasons, we hold that the term "professional services," as used in A.R.S. § 11–254.01, refers to those services rendered by a person engaging in a recognized discipline that necessarily requires advanced training and specialized knowledge to perform. Such services also typically result from the predominant use of intellectual skills rather than physical skills. Applying this definition, we further conclude that WCG did not provide professional services to the County, and the trial court therefore correctly ruled that the Agreement between those parties was void because it was not the product of competitive bidding. We additionally agree with the court that the County was not estopped from contesting the validity of the Agreement, and that WCG was not entitled to recover damages in quantum meruit. Therefore, and for the reasons set forth in our unpublished memorandum decision, we affirm.

HALL and GARBARINO, JJ., concurring.