NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

M2 REAL SOLUTIONS LLC,
*Plaintiff/Appellee*,

*v.*

WILLIAM PERRY,
*Defendant/Appellant*.

No. 1 CA-CV 17-0321
FILED 3-1-2018

Appeal from the Superior Court in Maricopa County
No.  CV2015-003675
The Honorable Randall H. Warner, Judge

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**

COUNSEL

Al Arpad, Esq., Phoenix
By Alexander R. Arpad
*Co-Counsel for Plaintiff/Appellee*

The Hallstrom Law Firm, PLLC, Phoenix
By Kyle Hallstrom
*Co-Counsel for Plaintiff/Appellee*

Jaburg & Wilk, PC, Phoenix
By Neal H. Bookspan, Laura Rogal
*Counsel for Defendant/Appellant*

_____

## MEMORANDUM DECISION

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge Jennifer M. Perkins joined.

_____

J O H N S E N, Judge:

**¶1**          William Perry appeals the superior court's grant of summary judgment in favor of M2 Real Solutions, LLC on M2's claim for damages under the Arizona Residential Landlord Tenant Act and on Perry's counterclaims for breach of contract and breach of the covenant of good faith and fair dealing. For the following reasons, we affirm in part, reverse in part and remand for further proceedings.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**          In June 2014, M2 and Perry entered a one-year lease of a Phoenix house. Perry, the owner of the house, knew M2 intended to sublease it to a corporation to use as temporary housing for one of its executives. The form lease, titled "Residential Lease Agreement," listed Perry as "Landlord" and M2 as "Tenant." A field designated "Occupancy" – which further stated that "[t]he Premises shall be used only for residential purposes and only by the following named persons" – contained the names of the corporate executive and his companion. The day after the lease was signed, M2 subleased the house to the corporation for one year.

**¶3**          The executive and his companion moved into the house. In mid-August, M2 emailed Perry, requesting repair of a roof leak. In early November, M2 again emailed Perry, informing him that the roof was still leaking and needed to be replaced. M2 also informed Perry that the water heater was leaking.

**¶4**          In early December, the executive and his companion moved out of the house. On December 13, M2 sent Perry a "Notice to Terminate Lease Agreement," asserting that the roof continued to leak and needed replacement and that Perry had failed to follow through on a promise to replace the leaking water heater. M2 asserted that Perry's failure to fix these defects constituted a breach of the lease affecting health and safety under Arizona Revised Statutes ("A.R.S.") section 33-1361(A) (2018), and warned

that the lease would terminate five days after receipt of the notice if the repairs were not made.[1]

**¶5**      Under A.R.S. § 33-1313(B) (2018), Perry was deemed to have received M2's notice of termination on December 18. According to the declaration Perry submitted on summary judgment, however, he actually received the notice December 23. That same day, a plumber Perry hired emailed M2 at 4:43 p.m., requesting access to the house to repair the water heater. M2 offered to let the plumber into the property later that evening, but the plumber declined, saying he needed to come the next day instead. M2 informed the plumber that M2 did not expect to be able to access the house the next day, and that he should contact Perry to enter the house at that time.

**¶6**      Upon hearing back from the plumber, Perry instructed the guard at the entrance of the gated community to forbid M2's representatives from entering until Perry could talk to them on the telephone. In his declaration, Perry explained he gave that instruction "to try to force" M2 to communicate with him. When M2's representatives arrived to inspect the house later on December 23, the guard would not allow them to enter after they refused Perry's demand that they speak with him. The next day, M2 sent Perry notice that it had terminated the lease on the grounds of (1) material non-compliance with the lease affecting health and safety and (2) unlawful exclusion of M2 from the property.

**¶7**      M2 then sued, alleging Perry breached the lease by failing to repair the leaks and by excluding M2 from the property on December 23. M2 sought damages and a declaratory judgment that M2 lawfully terminated the lease on December 24, 2014. Perry answered and filed a counterclaim, alleging M2 breached the lease and its implied covenant of good faith and fair dealing.

**¶8**      After discovery, the superior court granted M2's motion for summary judgment on its termination claim, upholding M2's termination of the lease based on Perry's unlawful exclusion of M2 from the property. *See* A.R.S. § 33-1367 (2018). The court awarded M2 the return of its security deposit, prorated rent for the remainder of December 2014 and double damages under A.R.S. § 33-132l(E) (2018) for failing to provide an itemized list of deductions from the security deposit.

---

[1]      Absent material change since the relevant date, we cite a statute's current version.

**¶9**      M2 then moved for summary judgment on Perry's counterclaims, asserting that the superior court's first summary judgment ruling had "logically and legally foreclose[d]" any possibility that Perry could succeed on his claims. Over Perry's opposition, the court agreed, concluding that because M2 had rightfully terminated the lease, it could not itself be liable for breaching the lease or the implied covenant of good faith and fair dealing. The court entered judgment in M2's favor for $20,322.57, plus $2,011.09 in pre-judgment interest, $19,425.00 in attorney's fees and $2,520.00 in costs – a total of $44,278.66.

**¶10**      Perry timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1) (2018) and -2101(A)(1) (2018).

## DISCUSSION

**¶11**      We review *de novo* the superior court's grant of summary judgment, "view[ing] the facts and any inferences drawn from those facts in the light most favorable to the party against whom judgment was entered." *Tierra Ranchos Homeowners Ass'n v. Kitchukov*, 216 Ariz. 195, 199, ¶ 15 (App. 2007). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). In ruling on a summary judgment motion, the court should consider only admissible evidence, such as admissible statements in an affidavit or deposition testimony. *In re 1996 Nissan Sentra*, 201 Ariz. 114, 117, ¶ 6 (App. 2001).

**A.      Summary Judgment on M2's Claim Under the Arizona Residential Landlord Tenant Act.**

**¶12**      The Arizona Residential Landlord and Tenant Act ("the Act") creates rights and remedies for tenants whose landlords unlawfully exclude them from their residences. As relevant here, it provides that "[i]f the landlord unlawfully . . . excludes the tenant from the premises . . . , the tenant may . . . terminate the rental agreement and . . . recover an amount not more than two months' periodic rent or twice the actual damages sustained by him, whichever is greater." A.R.S. § 33-1367.

**¶13**      Perry does not dispute that he denied M2 access to the house on December 23, 2014. He argues only that M2 lacked the right to terminate the lease under § 33-1367 because M2 was not a "tenant" as defined in A.R.S. § 33-1310(16) (2018). That statute defines a tenant as one "entitled . . . to occupy" a dwelling, and Perry argues that his lease with M2 specified that the corporate executive and his companion would be the only occupants.

Although Perry concedes M2 had a right to enter the house, he contends that because the lease did not list M2 as an "occupant," M2 had no right to occupy the house.

¶14        Although the Act defines "tenant" with respect to a right to "occupy," it does not define "occupy."  Ordinarily, "occupy" can mean, *inter alia*, "[t]o seize or take possession of; esp., to enter and take control of" or "[t]o hold possession of; to be in actual possession of."  Black's Law Dictionary (10th ed. 2014).  *See W. Corr. Grp., Inc. v. Tierney*, 208 Ariz. 583, 587, ¶ 17 (App. 2004) (approving use of "established and widely used dictionaries" to ascertain meaning of word in a statute).

¶15        We decline to adopt Perry's argument that, in the circumstances presented here, the statutory definition of "tenant" provides rights under the Act only to those listed in the "occupancy" provision in the lease.  In these circumstances, when the designated subtenant has vacated the property, the fact that the lease specified the subtenant as "occupant" does not deprive a corporate tenant of the right to "take and hold possession" of the rental property as its "occupant" under the Act.  The Act defines the tenant as a "person," and defines "person" as "an individual or organization."  A.R.S. § 33-1310(9), (16).  Thus, the Act clearly contemplates that an organization such as M2 may be entitled to "occupy" a dwelling unit and thereby take advantage of the remedies it grants to a tenant if its right to access the premises is infringed.  *See RSP Architects, Ltd. v. Five Star Dev. Resort Communities, LLC*, 232 Ariz. 436, 439, ¶ 13 (App. 2013) ("We must construe a statute to fulfill legislative intent by considering it as a whole and giving harmonious effect to all of its sections.").  While M2 as an organization could not occupy the house by living in it like its subtenants did, it had the right to occupy it in the ways that an organizational tenant can occupy a house; its representatives were entitled to enter at any time and remain for as long as desired to inspect, maintain, repair the property, or otherwise to prepare for a new subtenant.  *See* A.R.S. § 33-1310 (Act's definitions will control "unless the context otherwise requires").

¶16        Although Perry relies on the "occupancy" provision in the lease, other lease provisions support M2's contention that, at least as of late December 2014, M2 had the right to occupy the house.  The lease expressly granted the landlord a remedy in the event that "tenant [defined as M2] willfully fails to vacate the premises" as required.  The duty to vacate that the lease imposed on the "tenant" must imply a corresponding right to occupy.  The lease likewise required M2, as "tenant," to "maintain the Premises in a neat and undamaged condition," "dispose of all ashes, rubbish, garbage and other waste," and "generally conduct [itself] and

others in [its] charge, including pets, in a manner so as not to disturb their neighbors." These are not the sort of duties normally imposed on a party that lacks the right to occupy a rental property. These provisions, along with the right of M2 to re-sublease the house with Perry's consent after the corporate executive moved out, are further support for the conclusion that at the relevant time, M2 had the rights of a "tenant" under A.R.S. § 33-1367. Indeed, if the rights and obligations the lease granted and imposed on M2 did not encompass a right to occupy, no organization could "occupy" a dwelling unit – a result that would render ineffective the legislature's choice to include organizational tenants within the scope of the Act.

**¶17**        Finally, accepting Perry's argument would mean that after the subtenants vacated the house (and apparently, for as long as it took M2 to find and get approval for a new subtenant), no person or entity could exercise the rights of a "tenant" under the Act. But that would be an absurd result the parties surely did not intend. *See Grunewald & Adams Jewelers, Inc. v. Lloyds of London*, 145 Ariz. 190, 192 (App. 1985) (quoting *Hertzka & Knowles v. Salter*, 86 Cal. Rptr. 23, 29 (App. 1970)) ("A contract ought not to be construed to an absurd conclusion, if a reasonable one is possible.").

**¶18**        In sum, M2 had the rights of a "tenant" under the Act with respect to the house at the relevant time. Because Perry unlawfully excluded M2 from the property, M2 was entitled as a tenant to terminate the lease under § 33-1367. When M2 terminated the lease, it triggered Perry's duty under § 33-1321(D) to return the pro-rated rent and the security deposit, less any allowed offsets, established by an itemized list. His failure to do so rendered him liable for damages. The superior court therefore did not err in granting summary judgment to M2 on its termination claim or in awarding it damages under § 33-1321(E).

## B.        Summary Judgment on Perry's Counterclaims.

**¶19**        In his claim for breach of contract, Perry alleged M2 "failed to meet its payment obligations under the Lease," "failed to adequately maintain the property," and left the house unclean and damaged, including a ruined dishwasher and sink and damaged screens and carpets. Perry also alleged M2 breached the implied covenant of good faith and fair dealing, asserting that M2 "attempted to manufacture a justification to get out of the Lease."

**¶20**        In granting M2's second motion for summary judgment, the superior court reasoned that the summary judgment on M2's termination claim disposed of Perry's counterclaims: If the lease had terminated, M2

could not be liable for breach. On appeal, Perry argues the court erred because the breaches he alleged occurred before December 23, 2014, when M2 terminated the lease. We may affirm summary judgment if it is correct for any reason argued in the superior court. *Cook v. Orkin Exterminating Co.*, 227 Ariz. 331, 333, ¶ 12 (App. 2011).

**¶21** In response to M2's motion for summary judgment, Perry argued M2 breached by failing to pay a November 2014 service call charge of $75; he also cited an "unexplained" $125 charge on another bill relating to the water heater. M2 did not dispute that the lease required it to pay any service call fees, but argued it was not liable for the $75 fee because it did not know of the charge. M2's owner, Meghan Hartman, testified in her deposition, however, that she knew the November service call had occurred, that M2 was responsible for the cost of service calls, and that it had not paid the $75. This evidence establishes a genuine issue of fact as to whether M2 breached its contractual obligation to pay the $75 fee.

**¶22** Perry did not offer facts sufficient to establish a genuine issue of material fact as to the $125 charge, however. His response to the motion for summary judgment did not assert a legal basis for alleging M2 was liable for the charge. Further, although Perry also argued M2 left the house damaged and unclean, the court did not err by entering summary judgment against Perry on that allegation because, by excluding M2 from the property, Perry interfered with M2's ability to carry out its duty to maintain the property. *See Zancanaro v. Cross*, 85 Ariz. 394, 400 (1959) ("[T]he victim of a material . . . breach is excused from further performance.").

**¶23** Nor did Perry establish a material issue of fact on his claim for breach of the implied covenant of good faith and fair dealing. In that claim, Perry asserted M2 fabricated the property defects as a basis on which to threaten termination of the lease. Perry argued that bad faith is evident from the timeline of events, including M2's "unreasonabl[e] demand[] that the entire roof be replaced" after it had already been repaired, and M2's asserted failure to allow repair of the water heater.

**¶24** A tenant does not breach the duty of good faith and fair dealing, however, by asserting its rights under the lease to a roof and a water heater that do not leak. With its motion for summary judgment, M2 offered a declaration by Hartman that she personally inspected the house on December 13, discovered that the roof and water heater were still leaking, and, on that basis, sent Perry notice that M2 would terminate the lease absent prompt repairs. In her deposition, Hartman provided additional details, including that she saw a puddle of water under the water

heater during her December 13 inspection. These statements are sufficient to support a conclusion that the claimed defects actually existed and were not merely a subterfuge to get out of the lease. *See* Ariz. R. Evid. 602; *Villas at Hidden Lakes Condominiums Ass'n v. Geupel Const. Co.*, 174 Ariz. 72, 81 (App. 1992) (affidavit of moving party can support summary judgment by stating facts that would be admissible evidence if the affiant has personal knowledge of those facts and is competent to testify about the matters in the affidavit).

¶25 To defeat M2's motion for summary judgment, Perry needed to submit admissible evidence to counter the evidence offered by M2. *See Florez v. Sargeant*, 185 Ariz. 521, 526 (1996) ("Self-serving assertions without factual support in the record will not defeat a motion for summary judgment.") (citation omitted). Perry, however, provided no admissible evidence contradicting Hartman's testimony about the leaky roof and water heater, and no evidence that the roof and the water heater were repaired before M2 sent its December 13 "notice to terminate." During the events at issue here, Perry lived in Minnesota and was not regularly in Arizona; his declaration lacks any averment that he personally inspected the property at any relevant time. Nor did Perry provide statements from any other person with personal knowledge or any other evidence that the claimed defects did not exist when M2 mailed the December 13 notice.

¶26 In his own declaration, Perry stated that he directed a roofer to repair the roof in "early to mid-December 2014," before M2 sent the December 24 termination notice. Perry's statement that the exterior roof defects had been repaired before M2 sent that notice, however, was hearsay, not based on personal knowledge. *See* Ariz. R. Evid. 801, 802. Nor did he offer admissible evidence to support his contention that M2 breached by denying the plumber access to the house late in the day on December 23. Finally, Perry argued that M2 breached the covenant of good faith and fair dealing by failing to alert him to the fact that it had sent the December 13 notice. But he cites no authority for the proposition that a tenant who has sent such a notice must alert the landlord it is coming.

## C. Attorney's Fees.

¶27 The superior court awarded M2 its attorney's fees pursuant to the lease, which states that "[t]he prevailing party in any dispute or claim between Tenant and Landlord arising out of or relating to this Lease Agreement shall be awarded all their reasonable attorney fees and costs." A court determines the "prevailing party" based on the totality of circumstances. *Bobrow v. Bobrow*, 241 Ariz. 592, 598, ¶ 25 (App. 2017). We

will not disturb an award of attorney's fees if any reasonable basis exists for it. *Id.*

**¶28** Our reversal of summary judgment against Perry as to a *de minimis* $75 breach does not alter the fact that M2 generally "accomplished the result sought in the litigation," and thus M2 remains the prevailing party, entitled to its fees and costs. *Schweiger v. China Doll Rest., Inc.*, 138 Ariz. 183, 189 (App. 1983). We therefore affirm the superior court's award of attorney's fees and costs to M2.

## CONCLUSION

**¶29** We affirm the superior court's award of summary judgment in favor of M2 on its claim for statutory damages under A.R.S. §§ 33-1321(E) and -1367 for Perry's deprivation of M2's right to access the premises. We also affirm the superior court's award of summary judgment to M2 on Perry's counterclaims, except that we reverse the judgment entered on Perry's claim that M2 breached the lease by failing to pay a $75 service call charge incurred in November 2014. We affirm the superior court's award of attorney's fees to M2, and, pursuant to the lease and A.R.S. § 12-341.01(A) (2018), award M2 its reasonable attorney's fees and costs on appeal upon compliance with Arizona Rule of Civil Appellate Procedure 21. We remand for further proceedings on Perry's claim that M2 breached the lease by failing to pay the $75 service call charge.



AMY M. WOOD • Clerk of the Court
FILED: AA