NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

NORTH SCOTTSDALE ACQUISITION, LLC, *Plaintiff/Appellant*,

*v.*

CORE CENTER OF SCOTTSDALE LLC, et al., *Defendants/Appellees*.

No. 1 CA-CV 23-0042
FILED 01-18-2024

Appeal from the Superior Court in Maricopa County
No.  CV2021-014589
The Honorable Timothy J. Thomason, Judge (*Retired*)

**AFFIRMED**

COUNSEL

May, Potenza, Baran & Gillespie, PC, Phoenix
By Philip G. May, Andrew S. Lishko, Carrie A. Laliberte
*Counsel for Plaintiff/Appellant*

Sacks Tierney PA, Scottsdale
By Wesley D. Ray, Evan F. Hiller
*Counsel for Defendants/Appellees*

---

## MEMORANDUM DECISION

Judge Daniel J. Kiley delivered the decision of the Court, in which Presiding Judge Randall M. Howe and Judge Jennifer M. Perkins joined.

---

**K I L E Y**, Judge:

¶1        North Scottsdale Acquisition, LLC ("North Scottsdale") and Core Center of Scottsdale LLC ("Core Center") own neighboring properties that are subject to a Declaration of Easements, Covenants, Conditions, and Restrictions (the "CC&Rs"). North Scottsdale sued Core Center, alleging that Core Center improperly allows an offsite Tesla dealership to keep certain vehicles on Core Center's property in violation of various provisions of the CC&Rs. The trial court rejected North Scottsdale's claim, finding that Core Center's arrangement with the Tesla dealership does not violate the CC&Rs. We affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Core Center owns a seven-acre parcel in Scottsdale, Arizona that abuts a parcel North Scottsdale owns. Before North Scottsdale and Core Center acquired their respective parcels, the parcels comprised a single property that was the site of a vacant car dealership.

¶3        In 2014, Impact Church, Inc. ("Impact") purchased the property and split it into two parcels, keeping one for itself and selling the other to Sunrise Hayden Apartments, LLC ("Sunrise"). Impact intended to build a church on its parcel (the "Core Parcel"), while Sunrise intended to build an apartment complex on its parcel.

¶4        Sunrise and Impact entered into the CC&Rs with the stated purpose of "encouraging the development of attractive improvement[s]" and "preventing [the] haphazard or inharmonious development" of their parcels. Article 10 of the CC&Rs prohibits all uses that are "not consistent" with "first-class commercial centers." As relevant here, Section 10.1(h) prohibits "the outside storage of any products, goods or materials" while Section 10.1(j) prohibits the use of either parcel as "an establishment for sale of automobiles, trucks, mobile homes, or recreational motor vehicles." The CC&Rs also prohibit the "construction or installation of any improvements . . . in excess of three (3) feet in height" on a portion of the Core Parcel. As

the superior court later found, this three-foot height restriction on development "essentially [makes] parking the only economically viable use" for this portion of the Core Parcel.

¶5         Shortly after executing the CC&Rs, Impact began leasing a portion of the Core Parcel to a Chevrolet dealership to use as a parking lot. From 2014 to 2016, Impact entered into several other similar parking leases with various car dealerships.

¶6         Meanwhile, Sunrise began building an apartment complex on its parcel. In the spring of 2016, Impact and Sunrise worked together to ensure that construction activities on Sunrise's parcel would not interfere with the ability of Impact's lessee, a Ford dealership, to deliver cars to the Core Parcel pursuant to the parking lease. Later that year, however, Impact stopped leasing the Core Parcel to third parties because Sunrise's construction was "at a high point" and the road leading to the property was "ripped up."

¶7         Sunrise completed construction of the apartment complex, then sold the property to North Scottsdale in 2019. Impact, however, never built anything on the Core Parcel. Instead, it sold the parcel to Core Center as vacant land.

¶8         In 2021, the Core Center paved a portion of the Core Parcel and leased it to a Tesla dealership for the "parking and/or storage of cars, trucks or motorcycles and/or for the storage of [Tesla's] materials or equipment." In March 2022, Tesla and Core Center amended the lease to eliminate any reference to "storage," instead authorizing Tesla to use the property for the "parking of cars, trucks or motorcycles."

¶9         Alleging that Core Center's arrangement with Tesla violated Article 10 of the CC&Rs, North Scottsdale sent a cease-and-desist letter to Core Center, to no avail. North Scottsdale then sued for declaratory and other relief, alleging that Core Center is violating Article 10 of the CC&Rs by allowing "an establishment for [the] sale of automobiles" and "the outside storage of any products, goods, or materials" on the Core Parcel. North Scottsdale requested an evidentiary hearing to adduce evidence of "the intent of the signatories to the CC&Rs."

¶10        At North Scottsdale's request, the superior court held an evidentiary hearing at which representatives of Impact and Sunrise testified, offering their interpretations of various provisions of the CC&Rs. Representatives of the Tesla dealership also testified, explaining how the dealership uses the Core Parcel. They testified that, although Tesla

maintains a showroom at 8300 East Raintree in Scottsdale, Tesla vehicles are not purchased there, but instead are purchased online. After Tesla vehicles have been ordered and "shipped from the factory," the Tesla dealership "temporar[ily] park[s]" them on the Core Parcel "because there is not sufficient room at the Raintree location." However, "customers do not pick up their vehicles at the [Core Center] lot." Instead, "Tesla facilitates getting [each] car to [its] new owner" by retrieving the car from the Core Parcel and taking it to either the customer's home or the Raintree location for delivery.

¶11        Evidence at the hearing also showed that North Scottsdale's predecessor Sunrise knew at the time that Core Center's predecessor Impact leased part of the Core Parcel to "car dealerships" between 2014 and 2016, and Sunrise "never objected."

¶12        Following the hearing, the superior court issued its ruling finding, *inter alia*, that "no [Tesla vehicle] sales" are conducted on the Core Parcel. Instead, "pre-sold cars" are brought to the Core Parcel and kept there "on a temporary basis," "generally . . . for three days or so, and not longer than four days," before being delivered to their purchasers. The court concluded that Core Center's arrangement with Tesla did not run afoul of Section 10.1(j)'s prohibition on "an establishment for [the] sale of automobiles" because car sales "do not occur on [Core Center's] property."

¶13        The court further concluded, for two reasons, that keeping the Tesla vehicles on the Core Parcel did not constitute "outside storage of any products, goods or materials" in violation of Section 10.1(h).

¶14        First, the court found it "highly questionable that automobiles were intended to constitute 'products, goods or materials'" within the meaning of Section 10.1(h). The court reasoned that "the general intent" of Section 10.1(h) "appears to have been" to "avoid the presence of clutter" that would render the property "an eye-sore [*sic*]" by prohibiting the outside storage of "products or goods that are normally stored inside." The court found that the "new" and "expensive" Tesla vehicles that were kept on the Core Parcel "hardly detract[] from the general aesthetics of the area."

¶15        Second, the court held that, even if automobiles constituted "products, goods or materials" within the meaning of Section 10.1(h), the Tesla vehicles were *parked*, not *stored*, on the Core Parcel, and therefore did not run afoul of Section 10.1(h)'s prohibition on "outside storage." The court noted that "parking," unlike storage, "is not prohibited" by Section 10.1(h); indeed, "[t]he three-foot height restriction" on development set

4

forth in Article 10 makes parking the only practical use for that portion of the Core Parcel.

**¶16** North Scottsdale moved for reconsideration, which the superior court denied. The court then awarded attorney fees and costs to Core Center and entered final judgment under Arizona Rule of Civil Procedure 54(c).

**¶17** North Scottsdale timely appeals. We have jurisdiction under A.R.S. § 12-2101(A)(1).

## DISCUSSION

**¶18** North Scottsdale argues the superior court erred in holding that Core Center's arrangement with Tesla does not violate the CC&Rs. According to North Scottsdale, the arrangement "violate[s] the CC&Rs" by allowing Core Center's lessee to "engag[e] in car dealership activities and [in] the commercial storage of vehicles."

**¶19** Restrictive covenants constitute a contract among the owners of the subject properties. *See Ahwatukee Custom Ests. Mgmt. Ass'n, Inc. v. Turner*, 196 Ariz. 631, 634, ¶ 5 (App. 2000). As with all contracts, we review the court's interpretation of restrictive covenants *de novo. Swain v. Bixby Vill. Golf Course Inc.*, 247 Ariz. 405, 410, ¶ 19 (App. 2019). Our goal in interpreting restrictive covenants is to give effect to the parties' intention "as determined from the language of the document in its entirety and the purpose for which the covenants were created." *Powell v. Washburn*, 211 Ariz. 553, 554, 576-77 ¶¶ 1, 13 (2006) (adopting the Restatement (Third) of Property: Servitudes § 4.1(1) (2000)). If the terms are clear and unambiguous, we give effect to them as written. *Town of Marana v. Pima Cnty.*, 230 Ariz. 142, 147, ¶ 21 (App. 2012). "If the . . . language is reasonably susceptible to more than one meaning, extrinsic evidence may be admitted to interpret" it. *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 291, ¶ 15 (App. 2010).

**¶20** We review the superior court's factual findings under a "clearly erroneous" standard. *McNally v. Sun Lakes Homeowners Ass'n #1*, 241 Ariz. 1, 3, ¶ 11 (App. 2016). Even if the evidence is conflicting, a factual finding is not "clearly erroneous" if substantial evidence supports it. *Town of Florence v. Florence Copper Inc.*, 251 Ariz. 464, 470, ¶ 31 (App. 2021) (citation omitted). *See also United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 260 (App. 1983) ("[A]ny ambiguity in the documents is subject to a factual determination concerning the intent of the parties and is to be resolved conclusively by the trier of fact which, in this case, was the trial court.").

### A.    Core Center's Arrangement with the Tesla Dealership Does Not Violate Section 10.1(j) of the CC&Rs.

¶21            North Scottsdale argues that the superior court erred in finding that Core Center's arrangement with Tesla did not violate Section 10.1(j), which bars the use of the parties' parcels for "an establishment for [the] sale of automobiles, trucks, mobile homes, or recreational motor vehicles." Because Section 10.1(j) contains "no stated exception[s]," North Scottsdale contends, the provision "necessarily" prohibits "all activities which car dealerships perform," including "the storage of [its] vehicles." North Scottsdale concludes that the court erred by applying a narrow, "hyper literal [*sic*]" interpretation to the words "establishment for sale" instead of construing Section 10.1(j) broadly to prohibit "any activities that a car dealership would engage in."

¶22            The language of Section 10.1(j) does not support North Scottsdale's argument. Section 10.1(j) prohibits "an establishment for [the] sale" of vehicles; it does not purport to prohibit every activity in which an employee of a car dealership might engage. As Core Center correctly points out, under North Scottsdale's all-encompassing interpretation of Section 10.1(j), a Tesla representative would violate the CC&Rs by "talking on the phone with a distributor or supplier" while standing on the Core Parcel. We agree with Core Center that such an overbroad interpretation "makes absolutely no sense."

¶23            Because the CC&Rs do not define "establishment" or "sale," we turn to Black's Law Dictionary to interpret the terms. *W. Corr. Grp., Inc. v. Tierney*, 208 Ariz. 583, 587, ¶ 17 (App. 2004) ("To determine the plain meaning of a term, we refer to established and widely used dictionaries.") (citation omitted). The former is "[a]n institution or place of business" while the latter refers to "[t]he transfer of property or title for a price." Black's Law Dictionary (11th ed. 2019). As the superior court found, there is no "establishment" on the portion of the Core Parcel leased to Tesla, nor are "sales" conducted there. On the contrary, the property is a parking lot on which pre-sold vehicles are temporarily kept.

¶24            Moreover, North Scottsdale's assertion that the drafters of Section 10.1(j) intended to prohibit the use of the subject property for any activity in which a car dealership might engage is inconsistent with the fact that Impact leased the Core Parcel to several car dealerships from 2014 until 2016 with no objection by Sunrise. Admittedly, as the superior court observed, those leases were in effect before Sunrise completed the apartment building on its parcel and so Sunrise may not have been

concerned at the time about how the Core Parcel was being used. Nevertheless, Sunrise's failure to object when Impact leased the parking lot on the Core Parcel to car dealerships supports the conclusion that the drafters of Section 10.1(j) did not intend its scope to be so broad as to bar all activities in which a car dealership might engage. *See Associated Students of Univ. of Ariz. v. Ariz. Bd. of Regents*, 120 Ariz. 100, 105 (App. 1978) ("The acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contractual terms.").

**¶25**   The court did not err in determining that the manner in which Core Center allows the Tesla dealership to use its parcel does not violate Section 10.1(j).

> **B.**  **Core Center's Arrangement with the Tesla Dealership Does Not Violate Section 10.1(h) of the CC&Rs.**

**¶26**   North Scottsdale also argues that the superior court erred in finding that Core Center's arrangement with Tesla did not violate Section 10.1(h), which prohibits the use of either parcel for "the outside storage of any products, goods or materials." According to North Scottsdale, Section 10.1(h) bars Core Center's arrangement with Tesla because "Tesla's vehicles are products and/or goods" that are "stored" on the Core Center parcel while awaiting delivery to customers.

**¶27**   Although the superior court found that Section 10.1(h)'s reference to "any products, goods or materials" does not encompass motor vehicles, we accept, for purposes of this appeal, North Scottsdale's contention that motor vehicles constitute "products" or "goods" within the scope of Section 10.1(h).

**¶28**   However, the superior court further found that, "[e]ven if automobiles were intended, in general, to be covered by" Section 10.1(h), Tesla's vehicles were not "stored" on the Core Parcel. The court reasoned that the Tesla vehicles were "generally" on the Core Parcel for only "three days or so, and not longer than four days." The court concluded that Tesla's use of the Core Parcel is "more akin to a short term 'parking' situation than it is to a long term 'storage' situation." We agree.

**¶29**   Courts have long distinguished between "storage" and "parking" on the basis that "[o]ne has a certain degree of permanency, while the other connotes transience." *Monument Garage Corp. v. Levy*, 194 N.E. 848, 850 (N.Y. 1935); *see also State v. Larson Transfer & Storage, Inc.*, 246 N.W.2d 176, 179 (Minn. 1976) (same).

¶30 Although Arizona courts have yet to directly address the distinction between "storing" and "parking" vehicles, this Court has recognized that the former connotes a degree of permanency. In *State v. Jones*, 27 Ariz. App. 180 (1976), the defendant was convicted of second-degree burglary for stealing linens from a truck that a delivery driver had left temporarily unattended in "the loading area outside a linen supply [business]." *Id.* at 181. The court reversed his conviction on appeal, holding that the statutory elements of second-degree burglary "were not satisfied." *Id.* at 182. The *Jones* court explained that the statute required that "the subject of [the] burglary" be "a fenced or otherwise enclosed commercial yard *used for storing* equipment or supplies." *Id.* (emphasis added). Relying on the distinction between "parking" and "storage" enunciated by the Court of Appeals of New York in *Monument Garage*, *supra*, the *Jones* court reasoned that, by using the term "storage," "the legislature clearly intended that the yard be used for the keeping of equipment or supplies on a more permanent basis than the mere transitory period involved in loading and unloading." *Id.* (citation omitted). The *Jones* court concluded that the linens stolen from the truck outside the business were not being "stored" because they were "awaiting loading for delivery," and so the defendant's conviction for burglarizing a "commercial yard used for stor[age]" had to be set aside. *Id.*; *see also N.Y. Cent. R.R. v. Ridgefield*, 201 A.2d 67, 73 (N.J. App. 1964) (holding that temporary placement of new cars "for a day or two" in a railroad yard before being loaded onto trucks for delivery was not "storage" within the meaning of a zoning ordinance proscribing "storage").

¶31 Moreover, the word "storage" implies setting something aside with no immediate plans to use it again. *See* Black's Law Dictionary (11th ed. 2019) (defining "storage" as "[t]he act of putting something away for future use; esp., the keeping or placing of articles in a place of safekeeping, such as a warehouse or depository"). "Parking," by contrast, "has in it the element of a vehicle in use, being placed only temporarily until it is put in service again soon." *Univ. Place – Lincoln Assocs., L.P. v. Nelsen*, 530 N.W.2d 241, 243 (Neb. 1995); *see also Inc. Vill. of Great Neck v. Green*, 8 Misc. 2d 356, 357-58 (N.Y. Sup. Ct. 1957), *aff'd*, 5 A.D.2d 779 (N.Y. App. Div. 1958) (noting that parking connotes "temporar[y] place[ment]" of a vehicle "until it is about to again be put into service and use").

¶32 Based on this distinction, courts have found vehicles to be "stored" rather than "parked" when they are in an inoperable condition or otherwise unable to be put to immediate use. *See Green*, 8 Misc. 2d at 357-58 (holding that vehicles in dealership lot that were not "licensed for the road" were being "stored" in violation of municipal ordinance). By contrast,

courts have found vehicles to be "parked" when they are operable and immediately available for use. *See, e.g., Mergenthaler v. State*, 293 A.2d 287, 288 (Del. 1972) (holding that bus operator's use of lot to keep its school buses when school was not in session was "parking rather than storage" and therefore not in violation of ordinance prohibiting storage; citing with approval case law recognizing that "parking is of short duration" and implies "temporar[y]" placement of a vehicle "until it is about to be used again").

¶33        Here, a Tesla representative testified that the Tesla vehicles kept on the Core Parcel are "road ready" and "able to be legally driven" and that, to his knowledge, none has been mechanically "undrivable." After considering the evidence presented, the superior court found that the Tesla vehicles are, "[w]ith few exceptions," "pre-sold cars" that are "generally" kept on the Core Parcel for "three days or so, and not longer than four days," "before being delivered to customers." Because the placement, for four days or less, of pre-sold vehicles that are immediately available for use by their purchasers lacks the characteristics of "storage" identified in case law, the court did not err in finding that Core Center's arrangement with Tesla does not violate Section 10.1(h)'s prohibition on "outside storage."

¶34        North Scottsdale does not dispute that the CC&Rs allow parking on the Core Parcel but contends, for several reasons, that Tesla is storing, not parking, vehicles on the Core Parcel. First, North Scottsdale disputes the superior court's factual finding that Tesla vehicles are generally kept on the parcel for only three to four days. According to North Scottsdale, "[f]rom July 2021 to May 2022, Telsa vehicles stayed at the [Core Parcel] combined with the Raintree location for up to 6.3 days on average, and nearly all that time was spent on the [Core Parcel]."

¶35        North Scottsdale's reference to an average of "6.3 days" does not accurately reflect the time a Tesla vehicle spends on the Core Parcel because, as North Scottsdale acknowledges, that figure includes time spent at Tesla's Raintree location as well. In any event, the record, including the testimony of the Tesla representative, supports the superior court's factual finding that the vehicles are generally kept on the Core Parcel for four days or less. We therefore accept the court's factual finding and reject North Scottsdale's reliance on conflicting evidence. *Florence*, 251 Ariz. at 470, ¶ 31.

¶36        North Scottsdale also warns that the Tesla dealership may start keeping its vehicles on the Core Parcel longer than four days because Core Center's lease with the Tesla dealership sets forth "no limit on the amount of time Tesla is allowed" to keep its vehicles there. But whether

present factual circumstances may change is not a proper subject for a court's consideration in a declaratory relief action. On the contrary, a plaintiff's apprehension of future acts or events does not establish a justiciable claim for declaratory relief. *See Hunt v. Richardson*, 216 Ariz. 114, 125, ¶ 38 (App. 2007) ("future rights" cannot be determined in declaratory relief action "in anticipation of an event that may never happen").

¶37　　　　Next, North Scottsdale argues that, even accepting the court's finding that the Tesla vehicles are kept on the lot for "not more than four days," four days is too long to be considered merely "parked." In support of its position, North Scottsdale cites language from *Green*, *supra*, in which the New York Superior Court defined parking as "of short duration and measured by hours or at most by a day or two." 8 Misc. at 357. Because the Tesla vehicles are on the lot longer than "a day or two," North Scottsdale contends, those vehicles are necessarily "stored" rather than "parked."

¶38　　　　The term "storage" cannot be determined solely by reference to a specific number of days or hours. Instead, "the term has such varied usage that its exact meaning must be sought in the context of the statute or contract where it is used." *Carothers v. Bowles*, 148 F.2d 554, 556 (Emer. Ct. App. 1945). In the absence of any express language in the CC&Rs, we reject North Scottsdale's assertion that two days is the maximum length of time that a vehicle may be kept in one place before its status changes from "parked" to "stored."

¶39　　　　North Scottsdale argues, in the alternative, that the duration of time that the Tesla vehicles are kept on the Core Parcel is irrelevant because car dealerships "do not park" their vehicles on their lots. Instead, North Scottsdale argues, a car dealership's vehicles are always stored "regardless of the time duration." In support of this proposition, North Scottsdale cites the Nebraska Supreme Court's decision in *Nelsen*, *supra*. In *Nelsen*, two adjoining lots, Lot 1 and Lot 2, were burdened by a mutual parking easement which, by its terms, would automatically terminate if either lot owner ceased using its lot for "vehicular parking." 530 N.W.2d at 242-43. The court held that the mutual easement terminated when Nelsen, the owner of Lot 2, began "using Lot 2 as a used-car dealership." *Id.* at 243. By using Lot 2 "as a used-car dealership," the court held, Nelsen "was 'storing' and not 'parking' cars" on Lot 2. *Id.* at 243-44.

¶40　　　　*Nelsen*'s holding that a used car dealership "stored" rather than "parked" its unsold inventory is inapposite because, here, the Tesla dealership does not keep unsold vehicles on the Core Parcel for an indeterminate amount of time.

¶41        In support of its position that the Tesla vehicles on the Core Parcel were not "parked," North Scottsdale also relies on a Scottsdale ordinance providing that vehicles are "stored" (and therefore subject to being towed) if they are parked on public property for more than 72 consecutive hours. *See* Scottsdale Municipal Ordinance § 17-129.

¶42        North Scottsdale cites no record evidence, however, to suggest that the drafters of the CC&Rs intended to incorporate definitions found in Scottsdale ordinances. Instead, the evidence suggests that Section 10(h)'s prohibition of "outside storage" arose from concerns about avoiding clutter on the premises, not concerns about the length of time that vehicles would spend there. As Impact's representative testified, the purpose of Section 10(h) was "to prevent an owner or tenant from junking up the property" by, for example, leaving "pallets of goods outside or placing merchandise like a U-Haul or a Bobcat outside for sale, much like the Home Depot . . . does."

¶43        North Scottsdale further notes that, before its revision in March 2022, Core Center's lease with Tesla expressly provided that Tesla could use the Core Parcel for "parking and/or storage," which, North Scottsdale suggests, amounts to an admission by Core Center and Tesla that the latter is using the Core Parcel for "storage." This is unpersuasive; the intent of those who drafted the CC&Rs in 2014 cannot be established by terms that different parties used when they entered into a different contract seven years later.

¶44        We hold that the court did not err in determining that the manner in which Core Center allows the Tesla dealership to use its parcel does not constitute "outside storage" in violation of Section 10.1(h).

>    **C.    North Scottsdale Has Not Identified Any Other Provision of the CC&Rs that Prohibits Center's Arrangement with the Tesla Dealership.**

¶45        Finally, North Scottsdale asserts that interpreting the CC&Rs to authorize Core Center's arrangement with the Tesla dealership—which North Scottsdale refers to as "[a] stand-alone storage lot for an off-Parcel commercial car dealership"—violates the "purpose" and "intent" of the CC&Rs. Noting that the stated purposes of the CC&Rs include to "encouraging the development of attractive improvements" and "preventing haphazard or inharmonious development," North Scottsdale argues that the Tesla dealership's use of the Core Parcel is "hardly" an

attractive improvement, and instead constitutes impermissible "haphazard or inharmonious development."

¶46        Whether a particular use of property is "attractive," on the one hand, or "haphazard" and "inharmonious" with the surrounding area, on the other, are factual determinations, and so will be affirmed unless clearly erroneous. *McNally*, 241 Ariz. at 3, ¶ 11. After reviewing the evidence presented at the hearing, the superior court found that "it does not appear" that the Tesla dealership's use of the Core Parcel "detracts from the quality of the general surrounding area." On the contrary, the Tesla vehicles are "new" and "expensive," not "[j]unk cars" that are "sitting around indefinitely." The court concluded that "[u]se of the [Core Parcel] as a temporary parking lot of new, expensive, vehicles hardly detracts from the general aesthetics of the area." The record, including photographs of the scene that were admitted at the hearing, supports the court's finding. Because substantial evidence supports this factual finding, we affirm it. *Florence*, 251 Ariz. at 470, ¶ 31.

¶47        North Scottsdale argues that not all of the vehicles that Tesla keeps on the Core Parcel are new Teslas, asserting instead that Tesla also keeps customers' trade-in vehicles there. Although the Tesla representative testified that the vehicles Tesla keeps on the Core Parcel are "for the most part" pre-sold Teslas, he admitted that Tesla may also keep customers' trade-ins there as well. North Scottsdale presented no evidence, however, to suggest that the trade-in vehicles are inoperable, unsightly, or otherwise "junk" cars that detract from the overall appearance of the property. The superior court found that, although "[a] trade-in vehicle may . . . be parked" on the Core Parcel "for a short period of time," the Core Parcel "does not look like a used car lot." Evidence that Tesla keeps some trade-in vehicles on the Core Parcel for a brief period does not undermine or conflict with the court's factual finding that Tesla's use of the Core Parcel does not "detract[] from the general aesthetics of the area" in violation of the CC&Rs.

¶48        In a related vein, North Scottsdale argues that "[t]he trial court's factual finding as to the intent" of the drafters of the CC&Rs is "clearly erroneous," asserting that Sunrise's representative "clearly stated" in his testimony that the CC&Rs "prohibit[]" using the subject property as "a stand-alone storage lot for an off-property commercial car dealership." However, a trial court's factual finding is entitled to deference on appeal if record evidence supports it, even if the evidence is conflicting. *See Gutierrez v. Gutierrez*, 193 Ariz. 343, 347, ¶ 13 (App. 1998); *see also Kocher v. Dep't of Revenue*, 206 Ariz. 480, 482, ¶ 9 (App. 2003) ("A finding of fact is not clearly erroneous if substantial evidence supports it, even if substantial conflicting

evidence exists."). Further, the testimony of Sunrise's representative cited by North Scottsdale is at odds with Sunrise's failure to object to Impact's parking leases with car dealerships from 2014 to 2016. *See United Cal. Bank*, 140 Ariz. at 266 ("The construction or interpretation given to an agreement as evidenced by the acts and conduct of the parties with knowledge of the terms and prior to any controversy as to meaning arises is entitled to great weight and when reasonable will be adopted and enforced by the court.").

**¶49**     North Scottsdale contends that if Core Center's arrangement with Tesla does not violate the CC&Rs, then the CC&Rs must also leave Core Center free to lease its parcel to "U-Haul" or a "rental car agency" to keep its vehicles on the Core Parcel for "an indeterminate length" of time. According to North Scottsdale, "[t]his cannot be, and is not, what the drafting parties intended."

**¶50**     We need not determine, however, whether the CC&Rs would permit other, hypothetical uses of the Core Parcel. Instead, we affirm the superior court's determination that the CC&Rs do not prohibit the parking of "new" and "expensive" pre-sold Tesla vehicles "for a few days" until "they [can] be delivered" to their owners, and that such use does not "detract[] from the quality of the general surrounding area."

## CONCLUSION

**¶51**     For the foregoing reasons, we affirm.

**¶52**     North Scottsdale and Core Center both request an award of attorneys' fees and taxable costs on appeal under A.R.S. §§ 12-341 and 12-341.01. We deny North Scottsdale's request and grant Core Center's request for reasonable attorneys' fees and taxable costs under the CC&Rs upon its compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED:     TM